**John DeBONAVENTURA et al.,**
**Plaintiffs below, Appellants,**

v.

**NATIONWIDE MUTUAL INSURANCE**
**COMPANY, an Ohio Corporation,**
**Defendant below, Appellee.**

Supreme Court of Delaware.

Submitted Feb. 13, 1981.

Decided April 1, 1981.

■

Alfred J. Lindh (argued), and John T. Gandolfo, Jr., Wilmington, for plaintiffs below, appellants.

Richard E. Poole (argued), Daniel F. Lindley and Gregory A. Inskip, of Potter, Anderson & Corroon, Wilmington, for defendant below, appellee.

Before HERRMANN, C. J., McNEILLY and HORSEY, JJ.

McNEILLY, Justice:

After a trial on the merits in the Court of Chancery judgment was entered in favor of the defendant below in a reported opinion. *DeBonaventura v. Nationwide Mutual Insurance Co.*, Del.Ch., 419 A.2d 942 (1980). Plaintiffs appeal. We affirm largely on the basis of the Chancellor's opinion.

Plaintiffs do not challenge the Chancellor's findings of fact in this appeal, and we will not repeat them in detail herein. For present purposes, the following brief summary of the facts will suffice:

I

Plaintiffs are the owners and operators of several automobile body repair shops in New Castle County. Defendant is, *inter alia*, an insurer of material damage sustained by motor vehicles as a result of negligence covered by policies issued by defendant. The instant controversy relates generally to defendant's claims settlement practices in cases involving defendant's insureds or third party claimants entitled to recover for vehicular damage under defendant's issued policies. When an accident occurs involving a vehicle covered by one of defendant's policies, an assessment of the extent of damages and the cost of repair is made by defendant's adjusters. In estimating repair costs, defendant's adjusters have been guided by what defendant claims to be the competitive prices for such repairs in the New Castle County market. Such competitive prices take into account certain cost-reducing practices engaged in by a group of repair shops (not including any of the plaintiff shops) which will be referred to herein as the "favored shops." These

practices include giving discounts on new replacement parts and the use of rechromed bumpers rather than new bumpers as well as other used parts where feasible. By comparison to the favored shops, the plaintiff shops have traditionally refused to use second hand parts regardless of their condition or to give discounts on new parts. Also, it appears that the plaintiff shops include certain charges in their repair costs, e. g., a "materials" charge based on 10% of labor costs, that are not charged by the favored shops, and that the plaintiff shops charge somewhat more by the hour for labor than the favored shops. In short, the cost of repairing a damaged vehicle at the plaintiff shops is generally more than at the favored shops.

In order to facilitate effecting the necessary repairs and to assure that the competitive prices described above would be available to its insureds and third party claimants, defendant entered into informal agreements with the group of favored shops whereby such shops agreed to accept defendant's written repair estimates on vehicles referred to these shops for repair by defendant. These agreements stated that the favored shops, based on past experience, generally found defendant's estimates to be reasonable and adequate to put the damaged vehicles back into pre-accident condition. Also, the agreements provided that differences of opinion between the favored shops and defendant's adjusters regarding the adequacy of an estimate would be resolved between these shops and defendant without any penalty to the vehicle owners. As a practical matter these agreements enabled defendant to guarantee to its insureds and third party claimants that if they took their damaged vehicles to one of the favored shops, the vehicles would be repaired to pre-accident condition without any additional cost to the vehicle owner other than any deductible which might be required under defendant's policies. Because of the generally higher prices charged by the plaintiff shops and the absence of any similar agreement between them and defendant, no such guarantee could be made to

vehicle owners who insisted on having repairs made at the plaintiff shops or other higher priced shops. In such cases, if the actual cost of repair exceeded defendant's estimate, the vehicle owner would be required to pay any excess amounts out of his or her own pocket.

The Chancellor concluded that as a result of defendant's practices many, if not most, of defendant's insureds and third party claimants requiring vehicular repairs have employed the favored shops recommended by defendant with a resultant loss of potential repair business to the plaintiff shops. However, the Chancellor rejected plaintiffs' claim that this was due to improper economic coercion by defendant finding, rather, that it was due to:

> "the economic reality that most car owners with valid claims against the present defendant have decided that the quality of the workmanship and materials available at plaintiffs' shops is not sufficiently superior to that furnished at the competitive or preferred shops recommended by defendant to its insureds and claimants to warrant the paying of money out of one's own pocket to make up the difference between plaintiffs' prices and those offered by those shops which quote more competitive prices without, generally speaking . . . furnishing the higher quality of workmanship and materials found at plaintiffs' shops." 419 A.2d at 950.

In other words, the Trial Court concluded that the loss of business suffered by plaintiffs from defendant's practice of channeling its insureds and claimants to the favored shops was primarily due "to the simple fact that their [plaintiffs'] prices are too high and non-competitive to enable them to bid successfully for the work involved in repairing damaged motor vehicles insured by Nationwide." *Id.* at 951.

## II

Plaintiffs' principal contention on appeal is that the Chancellor misperceived the nature of the relief which plaintiffs were seeking, *i. e.*, an injunction restraining defendant from recommending the favored shops to its insureds and claimants for vehicular repairs covered by defendant's policies, and thereby misperceived the central issue in the case. The Chancellor's thorough opinion below completely rebuts this claim and shows without doubt that he fully understood the conflicting claims of the parties and the issues to be resolved. However, assuming *arguendo* that the Trial Court did labor under a misconception concerning the type of relief being sought, we conclude that such alleged error would not constitute grounds for reversal in the context of this case.

■ In order for plaintiffs to have been entitled to any relief, it was first necessary for them to establish the liability of defendant for some improper conduct. The primary cause of action relied upon by plaintiffs was defendant's alleged tortious interference with plaintiffs' prospective business opportunities by defendant's diversion of potential customers (*i. e.*, defendant's insureds and claimants) to the favored shops. The Trial Court correctly delineated the elements of this cause of action as follows:

> "[A] showing of deliberate interference with a prospective business opportunity requires (a) the reasonable probability of a business opportunity, (b) the intentional interference by defendant with that opportunity, (c) proximate causation, and (d) damages, all of which must be considered in light of a defendant's privilege to compete or protect his business interests in a fair and lawful manner, *Bowl-Mor Company, Inc. v. Brunswick Corp.*, Del.Ch., [6 Terry 49] 297 A.2d 61 (1972), and *Regal Home distributors, Inc. v. Gordon*, Del.Super., 66 A.2d 754 (1949)." 419 A.2d at 947.

As we read the chancellor's opinion, he essentially concluded that plaintiffs' had failed to establish that defendant's activities were the proximate cause of their damages and that defendant had shown that its activities were a fair and lawful means of protecting its own business interests and the economic interests of its insureds. Thus, the Chancellor's ultimate conclusion was that plaintiffs failed to establish the

liability of defendant for the alleged tort and were not, therefore, entitled to relief of any kind.

■ As for the issue of proximate causation, the Trial Court found that plaintiffs' loss of prospective business was due less to defendant's channeling of its insureds and claimants to the favored shops than to plaintiffs' deliberate decision not to compete with the favored shops on repair prices.

> "Thus, rather than seeking to compete in the market for business to be derived from the automobile body repair trade, plaintiffs . . . by the use of boycott measures, by the making of loose but effective agreements with their fellow litigants and other body shop operators on hourly wages and the like, by the giving of complementary estimates and by refusing to use sound used parts in their body repair work or to give discounts on new parts, have priced themselves out of the northern Delaware body repair market . . . ." *Id.* 419 A.2d at 949.

And elsewhere the Trial Court noted:

> "If an insured or claimant in the course of the settlement of any damage claim covered by insurance issued by Nationwide is satisfied with the latter's estimate of the amount of the reasonable cost to repair a damaged vehicle and thereafter accepts Nationwide's choice of a repair shop to perform such needed repairs, there would appear to be no basis for granting plaintiffs . . . relief . . ., plaintiffs' grievance being attributable to the simple fact that their prices are too high and non-competitive to enable them to bid successfully for the work involved in repairing damaged motor vehicles insured by Nationwide." *Id.* at 951.

In other words, plaintiffs' concerted pricing policies were the proximate cause of their loss of business from defendant's insureds and claimants. We find no error in these conclusions by the Trial Court.

■ As for the proffered defense of privilege, the Trial Court rejected plaintiffs' contention that defendant's channeling practices involved improper coercion against plaintiffs' shops. *Id.* at 950. Additionally, the Trial Court failed to find, as plaintiffs contended, that defendant's practices were inherently coercive as to defendant's insureds and claimants in deciding where to have their damaged vehicles repaired. After finding no improper coercion by defendant, the Chancellor proceeded to weigh the competing interests of the parties to determine whether defendant's conduct was privileged, see Restatement of Torts § 767 (1939) and Restatement (Second) of Torts § 767 (1979), and concluded that:

> "while plaintiffs' right to earn a fair return on their capital investment is clear, viewed in light of the rights of the insureds and the insurer, equally as valid is the right of the insured to have his or her car restored to the condition it was in prior to an accident at no additional cost other than the deductible part of his or her coverage as well as the right of the insurer to have needed repairs adequately accomplished for the least possible cost." 419 A.2d at 951.

The determination of whether an actor's conduct is "privileged" or "not improper" under § 767 of the Restatement and the Restatement (Second) is particularly factual, depending on a wide variety of factors to be applied to all of the facts and circumstances in a given case. In the case *sub judice*, the determination that defendant's conduct was not improper was made by the Trial Judge who presided over the litigation for more than seven years, including more than thirty days in trial. We are not inclined to second guess the Trial Court's ultimate conclusions, as plaintiffs would have us do, under such circumstances and where, as here, the findings of fact are supported by the record and the law applied to those facts was correct.

### III

Plaintiffs' remaining contentions warrant brief consideration.

■ Plaintiffs argue that the Chancellor erred in failing to consider its cause of action based on an alleged civil conspiracy

between defendant and the favored shops to tortiously interfere with plaintiffs' business relationships. Clearly, the Chancellor considered this claim and implicitly rejected it. The Trial Court concluded that defendant had not improperly interfered with plaintiffs' business relationships. Therefore, there was no unlawful conduct upon which the conspiracy claim could be grounded. Since we have accepted the Trial Court's conclusions as to the defendant individually, we also accept the Court's implicit conclusion of no liability as to the defendant acting in concert with others.

■ Lastly, plaintiffs argue that the Trial Court erred in failing to consider and resolve its claim that defendant slandered plaintiffs in dealing with its insureds and claimants. This claim is based on the same facts as the other causes of action, and we believe, as with the conspiracy claim, that this contention was considered and implicitly rejected by the Court below. Plaintiff argued that when defendant informs its customers needing repairs that plaintiffs' prices are "too high" and recommends one of the favored shops, defendant expressly slanders plaintiffs. Plaintiffs also argued that every time defendant tells a customer that the favored shops will repair his car for less than plaintiffs' shops, defendant implicitly slanders plaintiffs. The Trial Court found as fact that plaintiffs' prices are higher than those charged at the favored shops and are higher than the competitive prices generally prevailing in the appropriate market, and the record supports these findings.

It is hornbook law that truth is an absolute defense to a defamation action. Here, the Trial Court essentially found that defendant's statements were truthful, thereby implicitly rejecting plaintiffs' slander claim. We find no error in these determinations.

\* \* \* \* \* \*

The judgment of the Court of Chancery is affirmed.