EMPIRE FINANCIAL SERVICES,
INC., Plaintiff Below, Appellant,
Cross–Appellee,

v.

The BANK OF NEW YORK (DELA-
WARE), Defendant Below, Ap-
pellee, Cross–Appellant.

No. 310, 2005.

Supreme Court of Delaware.

Submitted: Feb. 8, 2006.
Decided: April 17, 2006.

Raymond M. Radulski (argued), Wilmington, and David Staats of the Law Office of David Staats, P.A., Wilmington, DE, for Appellant.

M. Duncan Grant of Pepper Hamilton, L.L.P., Wilmington, DE, for Appellee.

Before STEELE, Chief Justice, BERGER and JACOBS, Justices.

BERGER, Justice:

In this appeal we consider, among other issues, the appropriate measure of damages in a claim arising from the theft of certain business records and the related termination of a collection agency's contract with a bank. A jury found that, in conspiracy with the bank, the president of the collection agency stole business records from the agency, and used those records to service collections for the bank at a new collection agency. Because the contract between the bank and the original collection agency was terminable at will, however, the bank argued that the original collection agency suffered no damages. The trial court agreed, and entered a judgment of zero damages. We conclude that the trial court erred in limiting the collection agency to a contract measure of damages. The tort measure of damages, which should have been applied, allows recovery for lost profits resulting from the bank's wrongful conduct. Accordingly, we reverse and remand for a trial on damages.

### Factual and Procedural Background

From 1989 until 1997, Empire Financial Services, Inc. (Empire) was one of several "secondary" collection agencies retained by The Bank of New York (Delaware) (Bank) to service its unpaid credit card debt.[1] Under the terms of the operative Secondary Collection Agreement (Agreement), the Bank referred accounts to Empire for collection either by legal action or other "collection procedures." Empire

---

1. Creditors assign accounts to "secondary" collection agencies if, after approximately six months, the "primary" collection agencies have been unsuccessful.

was given 6 months to work the account. If Empire succeeded in establishing a repayment schedule with the debtor (a "paying" account), or executing on a judgment against the debtor (a "legal" account), Empire received 50% of all amounts recovered.

Empire compiled a database for the accounts it serviced, which included information such as debtors' addresses and job histories, contact numbers and notes of contacts, attorney lists, matters referred to attorneys, and other information developed by Empire in an effort to secure repayment from the debtors. Under the Agreement, Empire was required to provide the Bank with reports, but those reports only included the account number, referral date, status, and balance. In addition, the Bank was entitled to audit any and all accounts.[2] The Bank could recall one or more of its accounts at any time, for any reason.[3] Thereafter, Empire was entitled to receive its 50% commission only on payments made within 7 days after the recall. By January 1997, Empire's paying and legal accounts were yielding about $22,000 per month in profits.

During the months before his departure, Elviro Ocasio, Jr., President and general manager of Empire, attempted to acquire the company. He owned 25% of the stock and tried to purchase the remaining stock from the three other stockholders: Joseph Maccari, the founder, who owned 50%, and Frances and Daniel Brousseau, who both owned 25% jointly. Maccari rejected several buy-out proposals, however, so Ocasio

decided it was time to move on. At the end of January 1997, Ocasio contacted James Armistead, the Bank employee responsible for Empire's accounts. Ocasio told Armistead that he was going to leave Empire and join another collection agency. They met for lunch on January 29, 1997, and agreed informally that the Bank would transfer its accounts from Empire to Ocasio's new agency. On this subject, Ocasio testified as follows:

Q. So when you had lunch, had you basically reached an agreement with him that you were relatively confident that the [Bank] would give you the Empire accounts?

A. Although there wasn't a verbal or written agreement, I felt fairly confident that, when I moved to [the new agency], that I was going to get the [Empire] account.

\* \* \*

Q. To your thinking, did Mr. Armistead believe or know that you had sufficient information on the accounts to basically be able to step into Empire's shoes and service those accounts?

A. He had knowledge that I had some information that would help me service the accounts. To what detail, I don't think he knew the detail of what we had.[4]

Ocasio "clarified" this testimony by affidavit, stating that, when he left the luncheon with Armistead, he felt he had a verbal agreement that the Bank would transfer its accounts to the new agency, and that Armistead "knew [Ocasio] had information

2. The Agreement does not specify the information that is to be provided as part of an audit, but an Empire employee testified that the information Empire develops to service an account is not made available during an audit.

3. Empire disputed this term of the Agreement, arguing that the agreement included a

hand-written modification eliminating the Bank's right to recall paying and legal accounts. The parties agreed to submit this dispute to an arbitrator, who ruled in favor of the Bank. The Superior Court refused to modify the arbitrator's decision.

4. Appellee's Appendix, B–80,82.

that would help [him] service [the Empire] accounts without a reduction in cash flow...."[5]

On Friday, January 31, 1997, Ocasio resigned from Empire. Over the next two days, Ocasio vandalized Empire's offices and stole various client contracts, personnel files, and other business records. The following Monday, Gwen Wood, one of Empire's employees, opened the office in the morning and found it in shambles. There was a letter from Armistead on Ocasio's desk, dated January 29th, that did not appear to have been mailed. The letter advised Ocasio, as President of Empire, that the Bank was withdrawing all of its accounts because the Bank was pursuing a different strategy.

Ocasio and most of Empire's other employees joined DBA Collection and Administrative Services, Inc. (DBA) in early February, and the Bank transferred all of its Empire accounts to DBA within a few days after Ocasio started at DBA. Raul Torres, one of the Empire employees who moved to DBA, testified that, during the last week of January 1997, he helped Ocasio carry sealed boxes out of Empire's offices. Torres later learned that those boxes contained all the relevant collection data for the Bank's accounts. The documents were printed on January 27, 1997, and DBA's employees spent several weeks, working full-time, inputting the data from those documents into DBA's system. According to Torres, Ocasio instructed Torres to take the documents home with him every night, and to destroy them after the data had been transferred.[6]

In early February 1997, Empire sought injunctive relief against Ocasio in the United States District Court for the District of New Jersey. Empire obtained a temporary restraining order, and eventually reached a settlement with Ocasio. In 1999, Empire filed suit in Delaware against the Bank, Armistead, Ocasio, and other former Empire employees. The operative complaint, which now names only the Bank and Armistead as defendants, includes claims of conversion; tortious interference with business relationships; breach of contract; civil conspiracy; and unjust enrichment.[7]

In 2003, the Superior Court granted the Bank's motion for summary judgment as to all claims except civil conspiracy.[8] The conspiracy claim was tried in 2004, but the trial court severed liability and damages. The jury returned a verdict in favor of Empire on liability,[9] and the damages trial was scheduled to begin in April 2005. Before the second trial, however, the Bank again moved for summary judgment. The court ruled that "[t]he measure of damages in this case does not include ongoing

---

5. Appellee's Appendix, B–99.

6. Torres, obviously, did not follow that instruction, and, when he was subpoenaed in connection with related litigation, he turned the two boxes of documents over to Empire.

7. The parties stipulated to the dismissal of Armistead prior to trial.

8. *Empire Financial Services, Inc. v. Bank of New York*, 2003 WL 22701442 (Del.Super.).

9. The jury answered the following special interrogatories affirmatively:

1. Do you find that Empire has proven by a preponderance of the evidence that before Elviro Ocasio left his employment with Empire, he and James Armistead reached an agreement about what would happen with the Bank's accounts.
2. Do you find that the plaintiff, Empire, has proven by a preponderance of the evidence that the agreement included the commission of an unlawful or improper act?
3. Do you find that plaintiff, Empire, was damaged.

Appellant's Appendix, A–330–31.

lost profits. The tortious conduct which gives rise to the civil conspiracy claim here was this theft of the paper, of the documents, and the information contained therein." [10] The trial court entered a judgment of zero dollars based on its conclusion that Empire was limited to contract damages.

Both parties appealed. Empire seeks review of the trial court's: 1)refusal to review the arbitrator's decision about what constituted the operative agreement; [11] 2) grant of summary judgment to the Bank on Empire's breach of contract, unjust enrichment, and tortious interference claims; and 3) award of zero dollars in damages. The Bank cross-appeals from the trial court's denial of its motion for summary judgment on the civil conspiracy claim.

### Discussion

#### A. Arbitration award.

■ Empire's arbitration argument requires little comment. The parties stipulated to binding arbitration on the question of which version of the Agreement governs. Empire, dissatisfied with the arbitrator's factual determination, filed a complaint to modify or vacate the award. At the hearing on the Bank's motion for judgment on the pleadings, Empire argued that the Superior Court should review the arbitrator's findings of fact, including his decision to accept the authenticity of certain documents. The Superior Court responded:

> Well, [counsel], unless you can make a record that says you didn't agree to binding arbitration.... I see the deci-

sion of [the arbitrator]. I see an explanation for his findings.... And I think it's—it appears to be perfectly rational, and that's going to be the basis on which we proceed.

The trial court properly refused to undertake any additional review of the arbitrator's factual determination. [12]

Empire argues that the trial court should have reviewed the arbitrator's decision to determine whether he "follow[ed] the law," as required by the parties' stipulation. Empire does not identify any purported errors of law, however, and its omission is understandable, as there were no issues of law presented to the arbitrator. In short, Empire agreed to binding arbitration on one factual issue; the arbitration process was conducted fairly; and the arbitrator's decision was rational. Empire received all the review that was legally available after binding arbitration.

#### B. Denial of summary judgment on the civil conspiracy claim.

The Bank argues that the trial court erred in denying its motion for summary judgment on the conspiracy claim. The Bank says that there was no acceptable [13] evidence of: (1) an agreement between Armistead and Ocasio to transfer the Bank's accounts to DBA; or (2) the Bank's alleged knowledge that Ocasio was going to use stolen business records to service the Bank's accounts. Accordingly, no issue of fact existed and the Bank was entitled to judgment in its favor.

---

10. Appellant's Appendix, A–150.

11. See note 3, *supra.*

12. See: *Ruckman & Hansen, Inc. v. Delaware River & Bay Auth.,* 244 A.2d 277, 278 (Del. 1968).

13. The Bank seems to acknowledge that affidavits submitted by Ocasio and Torres in June 2004 provide evidence of the existence of an agreement. It argues, however, that those affidavits must be ignored because they are inconsistent with the witnesses' prior sworn testimony.

██ We review the trial court's denial of a motion for summary judgment for abuse of discretion. "There is no 'right' to a summary judgment. A trial court's denial of summary judgment is entitled to a high level of deference and is, therefore, rarely disturbed."[14] The trial court found it "troubling" that: (1) Armstead and Ocasio had a meeting; (2) shortly thereafter the Bank recalled all of its accounts from Empire; and (3) after Ocasio left Empire he provided the Bank with information about attorneys that apparently came from Empire's stolen records. The trial court concluded that the conspiracy claim "will turn on what inferences the jury draws from these and other circumstances."[15]

██ The Bank argues that Ocasio's testimony shows that there was no enforceable agreement between the alleged conspirators. To prove a conspiracy, however, it is not necessary that there be an express agreement.[16] What is necessary is evidence of a combination between two or more persons, followed by an unlawful act carried out in furtherance of such combination, and damages.[17] The record evidence was more than sufficient to create a triable issue of fact on the elements of a claim of conspiracy. At their luncheon meeting, Ocasio and Armstead discussed Ocasio's intention to leave Empire. Armstead indicated that he was interested in continu-ing to work with Ocasio, and both men knew that Empire's business records were necessary to continue servicing the accounts effectively. Moreover, even before they met, Ocasio had printed out Empire's account information. The trial court acted well within its discretion in concluding that the conspiracy claim should not be resolved on summary judgment.

## C. Zero dollar damage award.

██ Having prevailed on its civil conspiracy claim, Empire was entitled to be compensated for the harm caused by the tortious act committed in furtherance of the conspiracy.[18] Shortly before the damages trial, however, the trial court decided that Empire suffered no damages. The court started with the premise that Ocasio had committed the tort of conversion by stealing Empire's account records. Those records, however, had virtually no value unless Empire was servicing the Bank's accounts. The Bank, by contrast, was expressly authorized to withdraw its accounts from Empire at any time, for any reason. Thus, according to the trial court, the Bank's conduct was not wrongful, and could not be the source of harm for purposes of a conspiracy claim.

The problem with the trial court's analysis is that it fails to connect Ocasio's theft

---

14. *Telxon Corp. v. Meyerson,* 802 A.2d 257, 262 (Del.2002).

15. *Empire Financial Services, Inc. v. Bank of New York,* 2003 WL 22701442 at *3 (Del.Super.).

16. Comment a to Restatement (Second) of Torts § 876(a) explains that the conspirators' "agreement need not be expressed in words and may be implied and understood to exist from the conduct itself." *See also, e.g., Resolution Trust Corp. v. Heiserman,* 898 P.2d 1049, 1057 (Colo.1995) (quoting W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 46, at 323–24 (5th ed. 1984) for the proposition that an "[e]xpress agreement is not necessary, and all that is required is that there be a tacit understanding . . . .").

17. *AeroGlobal Capital Management, LLC. v. Cirrus Industries, Inc.,* 871 A.2d 428 (Del. 2005).

18. *See Beck v. Prupis,* 529 U.S. 494, 500–06, 120 S.Ct. 1608, 146 L.Ed.2d 561 (2000). *See also, e.g., Daugherty v. Kessler,* 264 Md. 281, 286 A.2d 95, 101 (1972) (holding that "[i]n action for the tort of conspiracy the damages recoverable are those which proximately result from the wrongful conduct.").

of business records with the Bank's decision to recall its accounts from Empire. The trial testimony established that the information contained in the stolen business records was proprietary to Empire, and was critical to the uninterrupted collection of paying and legal accounts. Without those records, DBA, or any other new collection agency, would have had to start with the Bank's original, stale information and track down the debtors' current addresses, phone numbers, places of employment, etc. in an effort to procure a new repayment agreement with each debtor. Empire was one of the Bank's top performing collection agencies. Armistead may have had some loyalty to Ocasio, as he claimed, but the Bank is in business to make profits. Thus, it is reasonable to conclude that the Bank would not have transferred its accounts from Empire to DBA unless DBA had the stolen business records needed to service the accounts.

The underlying tort, therefore, is not simply an act of conversion. Ocasio used wrongful means—theft—to interfere with an existing contract between Empire and the Bank. Because that contract was terminable at will, however, Ocasio's conduct is more properly characterized as interference with Empire's expectation that its business relationship with the Bank would continue. The Restatement (Second) of Torts § 766, comment g, addresses this situation:

Until [it is] terminated..., the contract is valid and subsisting, and the defendant may not improperly interfere with it. The fact that the contract is terminable at will, however, is to be taken into account in determining the damages that the plaintiff has suffered by reason of its breach....

One's interest in a contract terminable at will is primarily an interest in future relations between the parties, and he has no legal assurance of them. For this reason, an interference with this interest is closely analogous to interference with prospective contractual relations.

Accordingly, we construe Ocasio's conduct as wrongful interference with a prospective contractual relationship.[19] Empire's damages, therefore, are not limited to the value of the stolen records and of the assets that were destroyed at its offices. Empire can recover for the lost profits that it would have earned, but for Ocasio's wrongful interference, from servicing the Bank's accounts.[20]

### D. Grant of summary judgment on Empire's remaining claims.

In light of our damages ruling, we will not address Empire's claim that the trial court erred in granting summary judgment on its other claims. Empire has obtained a favorable jury verdict on the

19. This tort requires proof of: "(a) the reasonable probability of a business opportunity, (b) the intentional interference by defendant with that opportunity, (c) proximate causation, and (d) damages, all of which must be considered in light of a defendant's privilege to compete or protect his business interests in a fair and lawful manner." *DeBonaventura v. Nationwide Mutual Insurance Company*, 428 A.2d 1151, 1153 (Del.1981). *See also: Malpiede v. Townson*, 780 A.2d 1075, 1099 (Del. 2001).

20. Under Restatement (Second) of Torts § 766B:

One who intentionally and improperly interferes with another's prospective contractual relation ... is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of

(a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or

(b) preventing the other from acquiring or continuing the prospective relation.

civil conspiracy claim and will be entitled to seek recovery of all damages, including lost profits, arising from the wrongful conduct. Empire could not obtain any greater recovery for the same conduct under a different theory.[21] Therefore, Empire's remaining claims are moot.

### Conclusion

Based on the foregoing, the Superior Court's entry of a zero damages judgment is reversed and this matter is remanded to the Superior Court to hold a trial on damages, in accordance with this Opinion. Jurisdiction is not retained.

---

**21.** *See: Cede & Co. v. Technicolor, Inc.,* 542 A.2d 1182, 1191 (Del.1988).