## IN THE SUPERIOR COURT
## OF THE STATE OF DELAWARE

IMAGES HAIR SOLUTIONS )
MEDICAL CENTER, a division )
Of IMAGES, INC., and )
TOM PRENTICE, )
)
        Plaintiffs, )
    v. ) C.A. No. N13C-05-077 WCC
)
FOX TELEVISION STATIONS, )
INC., a Delaware corporation, and )
JOYCE EVANS, )
)
        Defendants. )

Submitted: October 5, 2015
Decided: January 29, 2016

**Defendants' Motion for Summary Judgment -- GRANTED**

**MEMORANDUM OPINION**

Austen C. Endersby, Esquire, Michael K. Twersky, Esquire, Fox Rothschild LLP, 919 N. Market Street, Suite 300, Wilmington, DE 19801. Attorneys for Defendants.

Daniel A. Griffith, Esquire, Whiteford Taylor Preston, LLC, 405 North King Street, Suite 500, Wilmington, DE 19801. Attorney for Plaintiffs.

**CARPENTER, J.**

Before the Court is Defendants Fox Television Stations, Inc. ("Fox") and Joyce Evans ("Evans") (collectively, "Defendants") joint Motion for Summary Judgment. The Plaintiffs in this matter are Images Hair Solutions Medical Center ("Images") and Tom Prentice ("Prentice") (collectively, "Plaintiffs"). On December 20, 2013, the Court granted Defendants' Motion to Dismiss Plaintiffs' defamation and false light claims.[1] After discovery, Defendants have moved for summary judgment on Plaintiffs' remaining claim for tortious interference with prospective business relations. For the foregoing reasons, the Motion will be GRANTED.

## BACKGROUND

Tom Prentice, together with his wife Paulette, owned and operated Images, a business offering restorative hair loss treatments.[2] The central focus of Plaintiffs' business model was the MEP-90 Hair Growth Stimulation System ("MEP-90"), a "revolutionary" laser-device recently approved by the FDA to treat androgenetic alopecia in females.[3] After securing start-up financing from an investor and contracting with a medical advisor, the Prentices opened the facility in April 2011.[4] To advertise Images' services, Plaintiffs purchased airtime on local radio stations

---

[1] *Images Hair Sols. Med. Ctr. v. Fox News Network, LLC*, 2013 WL 6917138, at *1 (Del. Super. Dec. 20, 2013).
[2] Pls. Compl., at 3, ¶ 11.
[3] *Id*. at 4, ¶ ¶ 13-16; Pls. Br. in Opp'n to Defs. Mot. for Summ. J, at 3.
[4] Pls. Compl., at 4, ¶¶ 17-19.

and television shows, including Talk Philly on CBS and the 10! Show on NBC, all of which were broadcasted throughout the greater-Philadelphia area.[5]

In March 2012, Defendant Joyce Evans, a reporter for Fox News, contacted Plaintiffs about producing and airing a segment on Images' MEP-90 treatments. Evans allegedly assured Plaintiffs that the broadcast would portray Images and the MEP-90 in a positive light. Relying on those assurances, Plaintiffs agreed to participate in the segment, which included interviews with Images' staff, a demonstration of the MEP-90 treatment on an Images' patient, and the patient's testimonial about her results. Following filming, Evans allegedly reiterated the positive nature of the segment and informed Plaintiffs that it would air directly after American Idol, when Fox's ratings were highest, on May 16, 2012. Given this information, Plaintiffs encouraged their current and prospective customer base to tune into Fox on the night of the broadcast.

The final segment, which the Court has reviewed, was approximately five minutes long and included footage in addition to the scenes filmed at Images, interviews with two doctors, textual explanations of Images' business, and commentary by Evans. Ultimately, Defendants are alleged to have "manipulated" the raw footage so as to present "Images and the MEP-90 system in the most

---

[5] *Id*. at 4-5, ¶¶ 20-22.

negative light possible."[6] Specifically, Plaintiffs claim Defendants selectively

edited out a significant amount of the patient's positive feedback[7] and replaced it

with negative commentary by individuals Evans recruited.[8] Additionally,

Plaintiffs allege the following statements presented "misleading information and

factual inaccuracies:"[9]

> (1) Evans's statement that she was "following up" on the "buzz" implying
> that she had conducted a prior investigation on Images, which she had not.

---

[6] Pl. Resp. in Opp'n to Def. Mot. for Summ. J., at 6.

[7] *Id.* at 6-7. Specifically, Plaintiffs object to the removal of the following portions of the raw footage with respect to the client's, Ms. Shahikian, testimonial:
- In the raw footage, Ms. Shahikian said on camera, "I'm not sure about how many treatments but I remember running in here in the middle of December and telling the girls in the front, 'Today is the day my hair looks different. Today is the day that I'm okay to come out with the wind blowing'". That positive comment in the raw footage was cut. Ms. Shahikian also said on camera in the raw footage that the MEP-90 device is "just something you have to try." This comment was cut out.
- Ms. Shahikian stated on camera in the raw footage "I feel better. I wake up every day, I do my hair, nobody is staring at me." This positive comment about the MEP-90 device from the raw footage was cut as well.
- In reflecting on the positive results she received, Ms. Shahikian said in the raw footage "How do you put a price on that?" This positive evaluation was also edited out.
- In the raw footage, Ms. Shahikian said "I realize I can't turn back the clock to where I used to be, but at least let me be able to go out and feel good." This statement was also edited out.
- In the raw footage, Ms. Shahikian stated "Not only am I growing new hair and I can see that from a number of different angles, but what I've got is healthier. There were two different textures of hair on my head not too long ago, oh yeah." This comment was edited out of the final broadcast.
- The raw footage had a comparison of Ms. Shahikian's hair before and after her treatment with the MEP-90 device with Ms. Shahikian stating "Look at my picture. Look at me now." That portion of the raw footage was edited out.
- In the raw footage, Mr. Prentice principal of Images described the process of how Images' customers receive treatment. That description stated only that customers receive oversight from Images' physician, "Dr. Luke."

*Id.* (internal citations omitted).

[8] *Id.* at 7.

[9] *Id.* at 8.

(2) Evans's statements that Kim was "cooking under the hood" and that she became "flushed" during treatment; thus, portraying the treatment as uncomfortable.
(3) The medical doctor's statements that "many if not all" of the positive results were attributable to the topical solution and not the MEP–90 machine.
(4) Evans's statement that patients at Images were required to go to their family doctor for examination and blood-work prior to being treated.
(5) Evans's comparison of Images to "internet medicine."
(6) The medical doctor's statement that he did not believe the MEP–90 treatment was worth $50 a treatment.[10]

Plaintiffs claim their business and reputation was "destroyed" as a result of the broadcast.[11] Specifically, they allege Images realized an "obvious and precipitous drop in business," lost profits, and lost value in its unsuccessful attempts to sell its locations for total damages of approximately $5.2 million.[12]

On May 9, 2013, Plaintiffs filed a Complaint asserting claims against Defendants for (1) defamation; (2) false light and invasion of privacy; and (3) tortious interference with prospective business relations. Defendants moved to dismiss Plaintiffs Complaint in response on July, 15, 2013. The Court heard oral

---

[10] *Id.* at 8-9.
[11] *Id.* at 9.
[12]*Id.* at 10 & Ex. C. Plaintiffs also cite two emails they received as consequences of the broadcast:
• Ms. Shahikian, who experienced positive results from the procedure (depicted in the broadcast as falsely positive results) wrote to Defendants, saying "…Watching your piece that night sickened me!! Why didn't you tell me this was going to be some one-sided debate? You chose words from sentences that made me look angry, not pleased,…What you did to Tom and Paulette was just downright WRONG!!!
• The producer from another television station wrote to Images, advising that Defendants' "discredited" the process and said about Defendants "I can't believe they did that". *Id.* at 9 (internal citations omitted).

5

arguments on August 26, 2013 and granted Defendants' motion with respect to the defamation and false light claims, but denied it as to the tortious interference claim in accordance with its December 20, 2013 opinion.[13]  On September 9, 2015, after discovery, Defendants filed the instant Motion for Summary Judgment.

## STANDARD OF REVIEW

The Court will grant summary judgment when it is clear from the record "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[14]  If the movant is able to show "that the undisputed facts support [its] claims or defenses,"[15] the burden shifts to the non-moving party to demonstrate that material facts remain in dispute for "resolution by the ultimate fact-finder."[16]  While the Court is required to view the evidence in a light most favorable to the non-moving party,[17] "[t]hat evidence… must be more than bare assertions without supporting facts."[18]

---

[13] *Images Hair Sols. Med. Ctr.*, 2013 WL 6917138, at *1.
[14] Super. Ct. Civ. R. 56 (c).
[15] *See Gerstley v. Mayer*, 2015 WL 756981, at *3 (Del. Super. Feb. 11, 2015).  *See also Acro Extrusion Corp. v. Cunningham*, 810 A.2d 345, 347 (Del. 2002) (defendants must show both "the absence of a material fact and entitlement to judgment as a matter of law").
[16] *See Gerstley*, 2015 WL 756981, at *3 ("It is not enough for the opposing party merely to assert the existence of such a disputed issue of fact. The opponent to a motion for summary judgment 'must do more than simply show that there is some metaphysical doubt as to material facts.'"). *See also Brzoska v. Olson*, 668 A.2d 1355, 1364 (Del. 1995).
[17] *See Brzoska*, 668 A.2 at 1364. *See also Merrill v. Crothall-Am., Inc.*, 606 A.2d 96, 99 (Del. 1992) ("In discharging this function, the court must view the evidence in the light most favorable to the non-moving party.").
[18] *Pfeiffer v. State Farm Mut. Auto. Ins. Co.*, 2011 WL 7062498, at *4 (Del. Super. Dec. 20, 2011).

6

Summary judgment is also appropriate "after adequate time for discovery…against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[19] In such cases, the Delaware Supreme Court has found "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."[20] Thus, the non-moving party must show sufficient evidence exists "for a jury to return a verdict for that party" and where "the evidence is *merely colorable, or is not significantly probative,* summary judgment may be granted."[21]

## DISCUSSION

In the instant motion, Defendants contend: (1) Plaintiffs failed "to adduce evidence on th[e] necessary elements" of tortious interference with prospective relations claim, namely with respect to the requisite elements of intent to interfere and improper conduct; and (2) the First Amendment bars the Plaintiffs "from trying to plead around a fatally flawed defamation claim by relabeling it as another

---

[19] *See Health Sols. Network, LLC v. Grigorov*, 2011 WL 443996, at *2 (Del. Feb. 9, 2011) (quoting *Burkhart v. Davies*, 602 A.2d 56, 59 (Del. 1991)).
[20] *See id.*
[21] *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 264 (1986)(emphasis in original)).

7

tort."[22]  In response, Plaintiffs argue (1) ample evidence supports their tortious interference claim and (2) issues of "intent" cannot properly be resolved on a motion for summary judgment.[23]

## I.     Elements of Tortious Interference

To succeed on a claim for tortious interference with prospective business relations, a plaintiff must prove: "(a) the reasonable probability of a business opportunity, (b) the intentional interference by defendant with that opportunity, (c) proximate causation, and (d) damages."[24]  These elements must, however, "be considered in light of a defendant's privilege to compete or protect his [or her] business interests in a fair and lawful manner."[25]  In other words, even cases of *intentional* interference will fail when unaccompanied by some proof that the defendant's conduct was *improper*.[26]

---

[22] Defs. Br. in Supp. of Mot. for Summ. J., at 2, ¶¶ 5-6.

[23] Pls. Br. in Opp'n to Defs. Mot. for Summ. J., at 11-12.

[24] *See DeBonaventura v. Nationwide Mut. Ins. Co.*, 428 A.2d 1151, 1153 (Del. 1981).  *See also Kimbleton v. White*, 2014 WL 4386760, at *8 (D. Del. Sept. 4, 2014) (applying Delaware law) *aff'd*, 608 F. App'x 117 (3d Cir. 2015); *Hursey Porter & Associates v. Bounds*,1994 WL 762670, at *16 (Del. Super. Dec. 2, 1994) ("The last element's reference to 'privilege' has the same meaning as 'with justification' or 'not improper' as used in connection with claims of tortious interference with contractual relations.").

[25] *See DeBonaventura,* 428 A.2d at 1153.

[26] *See Agilent Techs., Inc. v. Kirkland*, 2009 WL 119865, at *8 (Del. Ch. Jan. 20, 2009)("An alleged interference in a prospective business relationship is only actionable if it is wrongful."). *See also* Restatement (Second) of Torts § 766B (1979) ("One who intentionally and improperly interferes with another's prospective contractual relation…is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or (b) preventing the other from acquiring or continuing the prospective relation.").

For purposes of Defendants' Motion to Dismiss, this Court found Plaintiffs' allegations that a number of customers had cancelled appointments the day after the broadcast sufficed, at that juncture, to plead the first element of reasonable probability of business opportunity.[27] However, the Court expressed its concern, *sua sponte,* about whether Plaintiffs could show the requisite intent and impropriety:

> It is unclear to the Court what facts would support the allegation that Defendants, through the airing of their broadcast, intended to cause Plaintiffs' customers to cancel appointments or cease treatment or that Defendants knew such was certain or substantially certain to occur. Moreover, even if Plaintiffs were to point to facts supporting this contention, such interference must also be improper.[28]

Nevertheless, the Court allowed the tortious interference claim to proceed given the preliminary posture of the case and that the parties had not briefed the issue.[29] Now, almost two years of discovery later, Defendants move for summary judgment on the grounds that Plaintiffs have yet to produce evidence that (1) Defendants intended to interfere with Images' business or that (2) Defendants' reporting and airing of the broadcast was improper.

---

[27] *See Images Hair Sols. Med. Ctr.*, 2013 WL 6917138, at *6 ("Although Plaintiffs did not plead the names or identifying information within the Complaint, such is not necessary in the pleading stage. Plaintiffs have justifiable reasons for initially excluding the names of their potential clients and, as the case progresses, these identities are the proper subject of discovery and further inquiry."). Defendants do not, in the instant motion, again challenge this element.
[28] *Id*. at *7.
[29] *See id.*

## A. <u>Intentional Interference</u>

One intentionally interferes with another's prospective business when he or she acts with a "desire[] to bring about" the interference or with knowledge that "the interference is certain or substantially certain to occur as a result of his [or her] action."[30] A finding of intent by "substantial certainty" requires more than just knowledge of a likelihood or risk that interference could result.[31]

Here, Defendants argue Plaintiffs failed to offer evidence proving their conduct, airing the broadcast, was motivated by an intentional desire to harm Images or pursued despite substantial certainty that such harm would result.[32] Plaintiffs counter that a "cursory viewing" of the segment itself supplies adequate support for their position that the "only possible motivation" behind Defendants' decision to edit and air a broadcast depicting the MEP-90 in such a negative light was their desire to ruin the public's perception of Images.[33] According to Plaintiffs, the "agenda-driven" broadcast was intended "to take a product…favorably portrayed by Defendants' competitors (CBS and NBC) and

---

[30] *See* Restatement (Second) of Torts § 766B (1979). *See also* Restatement (Second) of Torts § 8A (1965) (stating that one acts intentionally when he or she "desires to cause consequences of [the] act, or …believes that the consequences are substantially certain to result from it").

[31] *See* Restatement (Second) of Torts § 8A (1965)("As the probability that the consequences will follow decreases, and becomes less than substantial certainty, the actor's conduct loses the character of intent, and becomes mere recklessness, as defined in § 500. As the probability decreases further, and amounts only to a risk that the result will follow, it becomes ordinary negligence, as defined in § 282.").

[32] Defs. Br. in Support of Mot. for Summ. J., at 9-10, ¶¶ 26-28.

[33] Pls. Br. in Opp'n to Defs. Mot. for Summ. J., at 8-9, 11-12.

10

about which there had been a 'buzz'…and destroy it."[34]  Plaintiffs also maintain

that it would be improper for this Court to resolve an issue of intent on a motion

for summary judgment.

It is generally true that, "when an ultimate fact to be determined is one of

intention[,] a decision as to intent on motion for summary judgment is

inappropriate."[35]  However, Delaware law makes clear that this "general rule

necessarily supposes that there is *some* evidence of the required intent."[36]  Thus,

where, as here, "a plaintiff … has had fair opportunity to utilize discovery to

explore his defendant's subjective state of mind and yet cannot point to anything

tangible which indicates that defendant had the intent…to interfere, plaintiff cannot

prevail and the defense motion must be granted."[37]

In its December 2013 opinion, this Court expressed doubt as to the viability

of Plaintiffs' tortious interference claim, finding it "difficult to envision the motive

or intent of the Defendants in interfering with the Plaintiffs' business

relationship."[38]  After two years of discovery, the Court has before it a copy of

Images' business plan, a damages calculation, emails received by the parties, and,

perhaps most relevant to the present inquiry, depositions of the Prentices and Ms.

---

[34] *Id*. at 8-10.
[35] *See Murphy v. Godwin*, 303 A.2d 668, 672-73 (Del. Super. 1973).
[36] *See id.* (emphasis added).
[37] *See id.*
[38] *Images Hair Sols. Med. Ctr.,* 2013 WL 6917138, at *7.

Evans. Unfortunately for Plaintiffs, the record as developed serves only to further undermine their tortious interference claim.

In her deposition testimony, Evans discussed her obligation to provide both sides of a news story and stated that the purpose of the Broadcast was to provide Fox's audience with a comprehensive and balanced look at the information she recovered on a newly FDA-approved device from a spectrum of sources so that viewers could "make up their own minds about what they're seeing."[39] To achieve this result, she testified that it is customary, as a news reporter at Fox, to consult a number of experts from varying fields especially when reporting on issues involving medicine or technology.[40] Evans further stated that "there was never any intent to harm the Prentices in anyway. …We did both sides, which is what I explained would happen from the very beginning."[41] She testified she was surprised to learn of the Prentices' complaints and that she relayed them to her supervisor immediately. Mr. Prentice's deposition testimony provides additional insight as to Defendants' conduct after the Broadcast, revealing that Fox responded to Plaintiffs' dissatisfaction by removing the segment from the network's public

---

[39] Evans Dep. at 129-130.
[40] *Id*. at 78-80.
[41] *Id*. at 166.

archives and offering the Prentices an opportunity to "come in and rebut the statements," which they declined.[42]

Having reviewed the record as a whole, this Court simply cannot agree with Plaintiffs' position that Defendants' "only possible motivation" for the Broadcast was to prevent Images from securing future business. Rather, the discovery tends to show that the Defendants' intention was simply to do their jobs of reporting the news. As Mrs. Prentice's testimony makes apparent, Plaintiffs were familiar with paying to advertise their services on local television networks and understood that their voluntarily participation in the Broadcast at no expense was not for advertisement, but for news purposes.[43] While the Plaintiffs hoped the Broadcast would provide the same benefit as their paid advertisements, it is simply not the function of the news to ensure that result. There is nothing here to suggest Defendants intended anything other than to provide a comprehensive review of the advantages and disadvantages of the MEP-90 system. Even if the Court were to accept Plaintiffs' dismay that positive footage was removed from the Broadcast to include commentary of other professionals as sufficient to prove intent to interfere, the claim would still fail because such conduct is *justified* by virtue of Defendants' journalistic profession. "[A] broadcaster whose motive and conduct is intended to foster public awareness or debate cannot be found to have engaged in the wrongful

---

[42] *Id*. at 300.
[43] Paulette Prentice Dep. at 46-49.

13

or improper conduct required to sustain a claim for interference with contractual relations."[44]  Thus, the Court need not decide the element of intent because Defendants cannot be found to have acted with the requisite impropriety.[45]

## B. <u>Improper Conduct</u>

Whether a given interference was *improper* depends on the facts and circumstances of the specific case.  Delaware courts assess the propriety of a defendant's conduct by reference to the factors set forth in § 767 of the Restatement (Second) of Torts:[46]

> (a) the nature of the actor's conduct,
> (b) the actor's motive,
> (c) the interests of the other with which the actor's conduct interferes,
> (d) the interests sought to be advanced by the actor,
> (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
> (f) the proximity or remoteness of the actor's conduct to the interference and
> (g) the relations between the parties.[47]

The ultimate inquiry then is "whether, upon a consideration of the relative significance of the factors involved, the conduct should be permitted without liability, despite its effect of harm to another."[48]

---

[44] *Huggins v. Povitch*, 1996 WL 515498, at *9 (N.Y. Sup. Ct. Apr. 19, 1996).

[45] *See Hursey Porter & Assoc. v. Bounds,* 1994 WL 762670, at *16 (Del. Super. Dec. 2, 1994) ("Even if plaintiff can establish the remaining elements of this cause of action, it cannot satisfy the 'without privilege' element. As a matter of law, the Bank's interference with the plaintiff's prospective business opportunity was not improper under the circumstances of this case. For this reason, defendants' summary judgment motion will be granted as to this claim.").

[46] *See, e.g., WaveDivision Hldgs., LLC v. Highland Capital Mgmt., L.P.*, 49 A.3d 1168, 1174 (Del. 2012).

[47] *See* Restatement (Second) of Torts § 767 (1979).

14

The first consideration, the nature of the conduct at issue, involves inquiry into *how* Defendants caused the alleged interference. The Broadcast, as promoted, edited, and aired is the means by which Defendants are accused of influencing Plaintiffs' prospective customers.[49] The Restatement provides that consideration of particular business customs or practices may be significant in determining whether Defendants' means was improper or not.[50] As Evans' deposition testimony supports, it is customary for the news to broadcast reports covering both sides of an issue of public interest. Plaintiffs have adduced no evidence purporting to prove this case was any different. Therefore, this factor must weigh in favor of Defendants.

The second factor of motive concerns whether Defendants desired to bring about the interference as the sole or partial reason for the broadcast. Evans's

---

[48] *See id.*

[49] Specifically, Plaintiffs maintain Defendants' interfered by:
  • Recogniz[ing] the "buzz" created by Images' burgeoning business and revolutionary hair-restoration device;
  • Solicit[ing] Images to have the device featured on Defendants' news program
  • Advis[ing] Images that the segment would present the device in a favorable light, thereby inducing Images' to maximize Images' customers' viewing of the segment;
  • Strategically tim[ing] the segment to maximize the viewership of the segment;
  • Edit[ing] the raw footage of the segment so as to eliminate the positive features of the device, misrepresent[ing] the experience of using the device and edit[ing] out the positive results obtained by a sample customer. Instead, in the editing process, Defendants replaced the positive "raw footage" with negative commentary and factual misrepresentations about the device.
 Pls. Resp. in Opp'n to Def. Mot. for Summ. J., at 1.

[50] *See* Restatement (Second) of Torts § 767 (1979) ("Violation of recognized ethical codes for a particular area of business activity or of established customs or practices regarding disapproved actions or methods may also be significant in evaluating the nature of the actor's conduct as a factor in determining whether … interference with…contractual relations was improper or not.").

15

deposition testimony reveals her motive was to inform Fox viewers about multiple perspectives on a recently FDA-approved product. Plaintiffs have not put forth any evidence to the contrary, which is especially significant because "[o]nly if the defendant's *sole* motive was to interfere with the contract will this factor support a finding of improper interference."[51] Thus, this factor weighs in favor of finding Defendants' conduct was not improper.

The third and fourth factors focus on the interests of the parties. The interest with which the Broadcast allegedly interfered was Plaintiffs' interest in prospective business. This factor requires consideration of the definiteness of the expectancy, and carries less weight here than it would in cases involving interference with *existing* contractual relationships. The interest sought to be advanced by the Defendants' conduct was to provide for the public a comprehensive report on a new technological device that had recently attracted local attention. A balance of these factors weighs in favor of finding Defendants did not act improperly. Additionally, consideration of the social interests at stake, the fifth Restatement factor, likewise weighs heavily in favor of Defendants given the First Amendment protections afforded to the news and society's interest in obtaining balanced reporting.

---

[51] *See WaveDivision Holdings, LLC*, 49 A.3d at 1174.

16

In terms of the proximity or remoteness of Defendants' conduct to the alleged interference, the deposition testimony belies Plaintiffs' contention that the Broadcast directly interfered with Images' prospective customers. While Plaintiffs' Complaint alleges five of six customers scheduled for appointments the day after the Broadcast cancelled, Mr. Prentice's deposition reveals that there is no evidence *anyone* cancelled that day because of the Broadcast and that at least nine customers did in fact come into Images for appointments that day.[52] Moreover, when asked if she could name a single customer who avoided Images or stopped doing business there as a result of the Broadcast, Mrs. Prentice responded she could not identify any and all she knew was that Images "didn't get calls" like it did after the paid advertisements.[53] As such, this factor also weighs in favor of finding Defendants did not act improperly.

Finally, the Court must consider the relationship between the parties involved. Defendants role was that of a public news source, Plaintiffs were voluntary participants in Defendants' report, and those who viewed the Broadcast were Defendants' audience, some of which included Plaintiffs' prospective customers. This was not a situation where Plaintiffs paid Fox to advertise its services, like they arranged with other networks on previous occasions, and Fox was under no obligation to tailor its Broadcast to Plaintiffs' liking. Even if

---

[52] Tom Prentice Dep., at 232-33.
[53] Paulette Prentice Dep., at 56.

Defendants' broadcast could be characterized as "interfering" with Plaintiffs' business, such interference was for the purpose of furthering their legitimate interest in relaying pertinent and well-balanced information to its viewership. Thus, this factor also weighs in favor of finding Defendants did not act improperly.

Based on the foregoing, the Court concludes as a matter of law that any interference Defendants may have had with Plaintiffs' prospective business was justified, or not improper. As such, Defendants are entitled to summary judgment on Plaintiffs' tortious interference claim.

## II.     First Amendment & Tortious Interference

Defendants also advance the argument that the First Amendment prohibits this Court from finding Defendants liable for tortious interference based on their non-defamatory broadcast. While the protections afforded by the First Amendment are broad, particularly in how the news is reported, the Court need not decide this issue because it has granted summary judgment on the grounds that Defendants' conduct was not improper.

## CONCLUSION

The Court has been extremely patient and has provided Plaintiffs a full opportunity to explore through discovery their tortious interference allegations. At best, Plaintiffs here were naive to believe that Fox news would do nothing more than a "flouf" piece and not investigate the MEP-90 system beyond Plaintiffs' own

18

comments. While they may feel they were mislead and their business unfairly portrayed, such sentiments do not provide a basis to legally challenge the Broadcast. The piece obviously was not what Plaintiffs had hoped for but, by entering the public forum, they opened Images and the hair loss treatment it provides to critical review. No wrongful conduct occurred here. Summary judgment is hereby entered in favor of Defendants.

**IT IS SO ORDERED.**

/s/ William C. Carpenter, Jr.
Judge William C. Carpenter, Jr.

19