# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

MICHAEL BLUE, CHRISTIAN GROH, )
and LING YIM, )
                                                 )
          Plaintiffs, )
                                                 )
          v. )     C.A. No. 2021-0268-MTZ
                                               )
DAN FIREMAN, CHRISTOPHER )
AKELMAN, OCTAVIO )
BOCCALANDRO, FIREMAN )
CAPITAL PARTNERS LLC, FIREMAN )
CAPITAL PARTNERS III, L.P., )
CROCKET RESOURCES S.A., and )
BASSLER CO CORP., )
                                               )
          Defendants. )

## MEMORANDUM OPINION

Date Submitted: November 9, 2021
Date Decided: February 28, 2022

Marcus E. Montejo and John G. Day, PRICKETT, JONES & ELLIOT, P.A., Wilmington, Delaware, *Attorneys for Plaintiffs Michael Blue, Christian Groh, and Ling Yim*.

Matthew D. Stachel, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, Wilmington, Delaware; Audra J. Soloway, Jaren Janghorbani, and Maia Usui, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, New York, New York, *Attorneys for Defendants Dan Fireman, Christopher Akelman, Octavio Boccalandro, Fireman Capital Partners LLC, and Fireman Capital Partners III, L.P.*

**ZURN, Vice Chancellor.**

In the fall of 2020, the board of a cannabis company worked to finalize its pending merger with a special purpose acquisition company ("SPAC"). Just as the deal was nearly complete, the target company's largest creditor stepped forward and demanded a series of favorable amendments to debt and warrant agreements, of which the creditor was the primary beneficiary. Armed with an irrevocable proxy that controlled 83% of the target's voting power, the creditor threatened to block the pending merger unless the board acceded to its demands. The company's five board members included two creditor partners and one creditor appointee. Two days later, the board approved the creditor's demanded amendments and announced the merger. The amendments diverted approximately $40 million of would-be merger consideration out of the stockholders' pockets and into the creditor's. The plaintiffs, former target stockholders and optionholders, assert claims for breaches of fiduciary duty, tortious interference, and civil conspiracy.

At the motion to dismiss stage, the defendants' primary argument is that the stockholders' claims are derivative, such that plaintiffs' standing was extinguished by the merger. This decision rejects that argument. Under longstanding Delaware Supreme Court precedent, the plaintiffs' fiduciary duty claim is direct because it alleges the merger was unfair due to the improper, material diversion of merger proceeds from the stockholders to the creditor. The defendants also challenge the merits of the stockholders' claims. This decision largely rejects those arguments as

1

well.  As to the breach of fiduciary duty claim, I conclude the creditor was the target's controller by virtue of its voting power, and, therefore, owed the target's stockholders a duty of loyalty.  The creditor breached that duty by holding the merger hostage to secure its demanded amendments.  But I dismiss the optionholders' tortious interference claim because it fails to plead a *bona fide* business expectancy. The pending motions to dismiss are therefore granted in part and denied in part.

## I.    BACKGROUND[1]

The Verified Complaint (the "Complaint") in this action asserts putative class action claims relating to the January 2021 merger (the "Merger") between Left Coast

---

[1] I draw the following facts from the Verified Complaint, available at Docket Item ("D.I.") 1 [hereinafter "Compl."], as well as the documents attached and integral to it.  *See, e.g.*, *Himawan v. Cephalon, Inc.*, 2018 WL 6822708, at *2 (Del. Ch. Dec. 28, 2018); *In re Gardner Denver, Inc. S'holders Litig.*, 2014 WL 715705, at *2 (Del. Ch. Feb. 21, 2014). Citations in the form of "Stachel Decl. —" refer to the exhibits attached to Transmittal Declaration Pursuant To 10 *Del. C.* § 3927 of Matthew D. Stachel in Support of Defendants' Brief in Support of Their Motions to Dismiss the Verified Complaint, available at D.I. 19.  Citations in the form of "OB —" refer to Defendants' Brief in Support of Their Motions to Dismiss the Verified Complaint, also available at D.I. 19.  Citations in the form "AB —" refer to Plaintiffs' Answering Brief in Opposition to Defendants' Motions to Dismiss, available at D.I. 26.  Citations in the form "RB —" refer to Defendants' Reply Brief in Support of Their Motions to Dismiss the Verified Complaint, available at D.I. 30.

Defendants attached excerpts of several documents to their motions to dismiss.  In some cases, they are properly incorporated by reference and are useful in illuminating the Complaint's allegations.  In others, the moving defendants have used those exhibits to construct a counternarrative.  *See* OB 8–14.  Insofar as the moving defendants seek to "rewrite Plaintiffs' well-pleaded complaint in favor of their own version of events," "that is not how our Chancery Rule 12(b)(6) works."  *In re CBS Corp. S'holder Class Action & Deriv. Litig.*, 2021 WL 268779, at *18 (Del. Ch. Jan. 27, 2021) (alterations and internal quotation marks omitted) (quoting *In re Clovis Oncology, Inc. Deriv. Litig.*, 2019 WL 4850188, at *13 n. 216 (Del. Ch. Oct. 1, 2019)).  Plaintiffs urge me to convert the motion

Ventures, Inc. ("Left Coast" or the "Company") and TPCO Holding Corp. ("TPCO"). Plaintiffs Michael Blue, Christian Groh, and Ling Yim (together, "Plaintiffs") are former Left Coast stockholders. Their core allegation challenges a side transaction benefitting the Company's controller, which they argue rendered the Merger unfair.

### A. Plaintiffs Form Their Business, Spin Off Left Coast, And Secure Financing.

In 2010, Blue and Groh, along with nonparty Brendan Kennedy, formed Privateer Holdings, Inc. ("Privateer"), an investment firm in the cannabis space. As of 2019, Privateer had four operating subsidiaries, including Left Coast. In February 2019, Privateer spun off Left Coast to its stockholders. Left Coast is a leading cannabis operator in California.

Left Coast has two classes of common stock: Class A stock, entitled to one vote per share, and high-vote Class B stock, entitled to ten votes per share. Because of this structure, the Class B stockholders control approximately 83% of the Company's outstanding voting power. The Class B shares were owned by Privateer's founders: Blue, Groh, and Kennedy. The Class A shares were more widely dispersed: many of the Company's employees, including plaintiff Yim

---

to dismiss into one for summary judgment and summarily deny it. *See* AB 13–16. I do not believe conversion is necessary here. Instead, after due consideration, I have ignored extraneous references offered to rewrite the Complaint. *See* Ct. Ch. R. 12(b).

(Privateer's Chief Accounting Officer), received Class A stock options in their compensation packages.

After the spinoff, Left Coast began to consider strategic financing options. In 2019 and early 2020, the Company raised approximately $25 million by issuing a series of convertible notes (the "2019 Notes"). The 2019 Notes were set to mature on March 28, 2021. The 2019 Notes would automatically convert into Company stock upon a "Qualified Financing," defined as the sale or issuance of at least $25 million in preferred stock.

Defendant Fireman Capital Partners, LLC ("Fireman Capital") and its affiliate, Fireman Capital Partners III, L.P. ("Fireman Capital III," and together with Fireman Capital, the "Fireman Entities") invested $10 million through 2019 Notes.[2] It appears defendants Bassler Co Corp. ("Bassler") and Crocket Resources S.A. ("Crocket") also loaned the Company money through the 2019 Notes.

### B. Left Coast Explores The Merger And Borrows More Money From Fireman Capital.

By the spring of 2020, the Company was actively engaged in talks with a potential buyer, Subversive Capital. Subversive Capital had already raised $575 million through a SPAC. Subversive Capital's affiliated SPAC entity would later become TPCO, the acquirer in the Merger. Subversive Capital planned to use the

---

[2] Stachel Decl. Ex. 2 at 1; *see* Compl. ¶ 24.

Merger to combine Left Coast and another cannabis company under the TPCO umbrella as one integrated business. Meanwhile, Subversive Capital was also negotiating a brand strategy agreement with Roc Nation, LLC, and its founder, Shawn C. Carter (professionally known as JAY-Z). Under that agreement, the new entity would become Roc Nation's "Official Cannabis Partner."[3]

The complexity of the transactions and the COVID-19 pandemic delayed the Merger. Left Coast needed additional cash to fund its operations in the meantime. Once again, it turned to Fireman Capital. In July 2020, Fireman Capital offered the Company $10 million in bridge financing (the "July 2020 Financing"). After securing the terms of the July 2020 Financing, Fireman Capital solicited other holders of 2019 Notes to participate. Ultimately, 88% of the 2020 money came from the Fireman Entities, Crocket, and Bassler.

This lifeline would help keep the Company afloat while the Merger was being negotiated, but it had a cost. Fireman Capital required (1) improvements on the 2019 Notes' terms, (2) a new note to secure the new loan, (3) new warrants to purchase Class A shares, (4) additional board representation, and (5) an irrevocable proxy to vote the founders' Class B common stock, which represented 83% of the Company's outstanding voting power. After negotiations, the Company agreed to these terms.

---

[3] Compl. ¶ 2.

First, the 2019 Notes were amended to favor the lenders, including Fireman Capital. These changes lowered the "Qualified Financing" threshold from $25 million to $7 million, and added additional automatic conversion events, including a SPAC transaction and an IPO.[4] The parties also extended the 2019 Notes' maturity date to July 31, 2021; the 2019 Notes would convert automatically upon maturity. Finally, the valuation cap used to determine the number of shares issuable upon conversion was dropped from $1 billion to $175 million, subject to adjustments.

The Company also issued a new promissory note (the "2020 Note") and warrants (the "2020 Warrants"). The 2020 Note was not convertible; instead, it carried a simple interest rate of 12% per year. The 2020 Warrants gave their holders the right to purchase Class A shares at a $0.01 per share strike price.

Both the 2020 Note and the 2020 Warrants provided their holders with downside protection in the event a "Qualifying Transaction," including a de-SPAC transaction like the Merger, was not completed by November 30, 2020.[5] If a Qualifying Transaction occurred before November 30, the Company owed 150% of the outstanding 2020 Note principle plus interest; if it did not, the 150% would balloon to 200%. The amount of shares the holder could buy under the 2020

---

[4] *Id.* ¶ 26.

[5] *See id.* ¶¶ 27–28, 30; Stachel Decl. Ex. 6 § 2(b)(vii) (defining a "Qualifying Transaction"); Stachel Decl. Ex. 3 § 2(b)(iii) (same); *see also* Stachel Decl. Ex. 4 at 1 (referencing a "Qualifying Transaction").

Warrants similarly varied based on the timing of a "Qualifying Transaction." If a "Qualifying Transaction" was timely completed, the holder could purchase an amount of shares worth $10 million, multiplied by 150%, divided by the applicable share price. But if a Qualifying Transaction did not occur before November 30, the multiplier was doubled to 300%.

Finally, Fireman Capital gained two important governance levers. The first was additional representation on the Company's five-person board of directors (the "Board"). Fireman Capital appointed three members: its founder, defendant Dan Fireman; a partner, defendant Christopher Akelman; and Bassler's founder and principal Octavio Boccalandro (together, the "Director Defendants"). The other Board members were Brett Cummings, Left Coast's CEO; and Adam Dawson, elected by the Company's founders as Class B shareholders. Second, the founders, executed an irrevocable proxy to give Fireman Capital the power to vote their Class B shares (the "Class B Proxy"). By virtue of the Class B Proxy, Fireman Capital controlled 83% of the Company's voting power.

Plaintiffs allege the purpose of this structure was clear: Fireman Capital funded Left Coast's continued operations so that it could survive until the Merger, was rewarded handsomely, and gained the power to steer the Company through a successful transaction. Left Coast had a powerful incentive to close the Merger by November 30, 2020. If it did not, Fireman Capital would make money anyway, as

7

its stake in the 2020 Note and the 2020 Warrants would become more valuable. And in any case, Fireman Capital had voting control over the Company and thus controlled the outcome.

### C. On The Eve Of The Merger, Fireman Capital Demands Favorable Amendments To The 2019 Notes And 2020 Warrants.

By August 2020, the Company and Subversive Capital were negotiating the key terms of the Merger, including Fireman Capital's participation in a private placement to help fund it. Those negotiations were nearing the finish line in October 2020. Around that time, Fireman Capital began to clamor for more consideration. It complained the treatment of the Merger in the 2019 Notes and the 2020 Warrants did not reflect the minimum premium it expected to receive. Just as negotiations on the Merger were winding down, Fireman Capital demanded favorable amendments to the 2019 Notes and the 2020 Warrants (the "Amendments"). Among the Amendments was a substantial reduction in the 2020 Warrants' exercise price: from $0.01 per share to less than $0.0001 per share. The Complaint describes this reduction as one "[a]mong other changes," but does not detail any other Amendments.[6] Fireman Capital continued to push its demanded Amendments while the Board finalized the Merger documents.

---

[6] Compl. ¶ 36.

On November 22, the Board unanimously approved the Merger documents. But Fireman Capital declared it would not vote its Class B Proxy in favor of the Merger unless its demands to amend the 2019 Notes and the 2020 Warrants were met. Cummings and Dawson, the two Board members not appointed by Fireman Capital, determined the Merger's closing would be compromised unless the Board agreed. On November 24, the Board approved the Amendments; Plaintiffs assert the Board was conflicted and controlled.

Plaintiffs allege that as a result of the Amendments, $40 million in Merger consideration was diverted from the Company's common stockholders to the Defendants. Plaintiffs also plead the Amendments diverted value from the Company's optionholders to Defendants: the Amendments reduced the value received by optionholders in the Merger, and caused many of the Class A options held by Yim and others to be "underwater" and worthless. The Complaint does not detail how these outcomes were effectuated.

Also on November 24, Subversive Capital announced it had entered into definitive transaction agreements to effectuate the Merger. The Merger closed on January 15, 2021.[7]

---

[7] *See* Stachel Decl. Ex. 10 at 1.

9

### D. Plaintiffs File This Action.

Plaintiffs filed their Complaint on March 30.[8]  The Complaint asserts four counts, all styled as class action claims on behalf of all the Company's former stockholders.  Count I claims Fireman Capital "and its affiliates," as controllers, and the Director Defendants breached their fiduciary duties by approving the Amendments.[9]  Count II claims Defendants tortiously interfered with the optionholders' expectancies in their options by approving the Amendments and causing those options to become worthless.[10]  Count III claims Fireman Capital, Crocket, and Bassler conspired in connection with the breaches of fiduciary duty alleged in Count I.[11]  Count IV claims Fireman Capital, Crocket, and Bassler conspired in connection with the tortious interference alleged in Count II.[12]

The Fireman Entities and Director Defendants (together, the "Moving Defendants") filed the pending motions to dismiss (the "Motions") on April 21 and April 27, respectively.[13]  Crocket and Bassler have not yet appeared and did not join the Motions.  It appears this is because service on them is not yet complete.[14]  The

---

[8] *See generally* Compl.

[9] *Id.* ¶¶ 47–55.

[10] *Id.* ¶¶ 56–60.

[11] *Id.* ¶¶ 61–67.

[12] *Id.* ¶¶ 68–75.

[13] D.I. 9; D.I. 12.

[14] *See* D.I. 2; D.I. 4.

Motions argue Plaintiffs' claims are all derivative claims that Plaintiffs lack standing to assert after the Merger. The Motions also argue, in the alternative, that all four counts fail to state claims upon which relief can be granted. The parties briefed the Motions and the Court heard oral argument on November 9.[15]

## II. ANALYSIS

The standards governing a motion to dismiss under Court of Chancery Rule 12(b)(6) for failure to state a claim for relief are well settled:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and ([iv]) dismissal is inappropriate unless the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible to proof."[16]

Thus, the touchstone "to survive a motion to dismiss is reasonable 'conceivability.'"[17] This standard is "minimal"[18] and "plaintiff-friendly."[19] "Indeed, it may, as a factual matter, ultimately prove impossible for the plaintiff to prove his

---

[15] D.I. 36; D.I. 37 [hereinafter "Hr'g Tr."].

[16] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (citations omitted).

[17] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011).

[18] *Id.* at 536 (citing *Savor*, 812 A.2d at 896).

[19] *See, e.g.*, *Clouser v. Doherty*, 175 A.3d 86 (Del. 2017) (TABLE); *In re Trados Inc. S'holder Litig.*, 2009 WL 2225958, at *9 (Del. Ch. July 24, 2009).

claims at a later stage of a proceeding, but that is not the test to survive a motion to dismiss."[20]

### A. Plaintiffs' Claims Are Direct Under *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*[21] And *Parnes v. Bally Entertainment Corp.*[22]

The Motions present an important gating issue: whether Plaintiffs' claims are direct or derivative. The Moving Defendants argue Plaintiffs' claims are derivative so they must be dismissed because the Merger extinguished Plaintiffs' derivative standing. Standing is a threshold question, so I address it first.[23]

"A derivative suit enables a stockholder to bring a suit on behalf of the corporation for harm done to the corporation."[24] By contrast, "a stockholder who is directly injured retains the right to bring an individual action for injuries affecting his or her legal rights as a stockholder."[25] In distinguishing between the two, the Court looks at "the nature of the wrong alleged, not merely at the form of words used in the complaint."[26] "Classification of a particular claim as derivative or direct can

---

[20] *Cent. Mortg.*, 27 A.3d at 536.

[21] 845 A.2d 1031 (Del. 2004).

[22] 722 A.2d 1243 (Del. 1999).

[23] *See Brookfield Asset Mgmt., Inc. v. Rosson*, 261 A.3d 1251, 1262 (Del. 2021).

[24] *Id.* (citing *Tooley*, 845 A.2d at 1036).

[25] *Id.* at 1263.

[26] *Brokerage Jamie Goldenberg Komen Rev Tru U/A 06/10/08 Jamie L Komen Tr. for Komen v. Breyer*, 2020 WL 3484956, at *7 (Del. Ch. June 26, 2020) (internal quotation

be difficult,"[27] and the line "is often a narrow one."[28] "Application of these principles assumes heightened significance in the post-merger context because stockholders typically lose standing to pursue derivative claims when a merger extinguishes their status as stockholders under the continuous ownership rule."[29] Because of this rule, the distinction between direct and derivative claims "is essentially outcome-determinative of any breach of fiduciary duty claims that can be asserted in connection with the merger by the target company stockholders."[30]

marks omitted) (quoting *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 808, 817 (Del. Ch. 2005), *aff'd*, 906 A.2d 766 (Del. 2006)).

[27] *Brookfield*, 261 A.3d at 1263 (citing *Agostino v. Hicks*, 845 A.2d 1110, 1116–17 (Del. Ch. 2004)).

[28] *Kramer v. W. Pac. Indus., Inc.*, 546 A.2d 348, 352 (Del. 1988) (internal quotation marks omitted) (quoting *Abelow v. Symonds*, 156 A.2d 416, 420 (Del. Ch. 1959)).

[29] *Komen*, 2020 WL 3484956, at *7 (Del. Ch. June 26, 2020) (internal quotation marks omitted) (quoting *In re Straight Path Commc'ns Inc. Consol. S'holder Litig.*, 2018 WL 3120804, at *10–12 (Del. Ch. June 25, 2018), *aff'd sub nom. IDT Corp. v. JDS1, LLC*, 206 A.3d 260 (Del. 2019) (TABLE)). Though this opinion references other opinions from the *Straight Path* case, I refer to the aforementioned opinion throughout as "*Straight Path.*"

[30] *Golaine v. Edwards*, 1999 WL 1271882, at *4 (Del. Ch. Dec. 21, 1999). Then-Vice Chancellor Strine went on:

> Put another way, the individual-derivative distinction comes as close as possible to being a determination of the merits of a claim. By denominating a claim as derivative in this context, the court comes very near to immunizing the defendants from any culpability for the conduct complained of. While the courts may indulge the notion that the claims still "survive" as waste, mismanagement, or unfairness claims for dimunition [sic] of the value of the target, they usually die as a matter of fact.
>
> . . .

So too here: if Plaintiffs' claims are derivative, then the Merger extinguished their standing to sue and I must dismiss them.[31] But in my view, Plaintiffs' claims are direct.

### 1. Distinguishing Between Direct And Derivative Claims

The Delaware Supreme Court recently reaffirmed *Tooley* as the operative test for whether a claim is direct or derivative.[32] Under *Tooley*, that inquiry must turn solely on the following questions:

(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and
(2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?[33]

"Where all of a corporation's stockholders are harmed and would recover *pro rata* in proportion with their ownership of the corporation's stock solely because they are stockholders, then the claim is derivative in nature."[34] By contrast, a stockholder

---

Thus cloaked within the application of the individual-derivative distinction to post-merger claims is the actual reality of the situation. If the harm alleged is seen as a derivative one, it is nearly certain to be non-compensable. But if the harm alleged is seen as individual, it may be compensable.

*Id.* at *5.

[31] *See, e.g.*, *In re Primedia, Inc. S'holders Litig.*, 67 A.3d 455, 476 (Del. Ch. 2013) (citing, *inter alia*, *Lewis v. Anderson*, 477 A.2d 1040, 1050 n.19 (Del. 1984), and 8 *Del. C.* § 259(a)).

[32] *See Brookfield*, 261 A.3d at 1263.

[33] *Tooley*, 845 A.2d at 1033.

[34] *Feldman v. Cutaia*, 951 A.2d 727, 733 (Del. 2008).

14

pleads a direct claim if he "demonstrate[s] that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation."[35]

Plaintiffs invoke *Parnes v. Bally Entertainment Corp.* to argue that their breach of fiduciary duty claims are direct, rather than derivative, because their attack on the Amendments is at bottom an attack on the Merger and its fairness.[36] Here, like the cases that have gone before, it is "difficult to determine whether a stockholder is challenging the merger itself, or alleged wrongs associated with the merger."[37] And so, like the cases that have gone before, I offer my view of the evolution of *Parnes* and its progeny.[38]

Delaware law permits a former target stockholder to challenge a merger's fairness or validity through a direct claim, even after that merger extinguished the stockholder's derivative standing. In *Cede & Co. v. Technicolor, Inc.*,[39] our Supreme Court considered a stockholder's standing to bring a direct claim for

---

[35] *Tooley*, 845 A.2d at 1039.

[36] *See* AB 22–30 (discussing *Parnes* and its progeny).

[37] *Parnes*, 722 A.2d at 1245; *see also Turner v. Bernstein*, 1999 WL 66532, at *10 (Del. Ch. Feb. 9, 1999) ("As our Supreme Court recently recognized in [*Parnes*], a thin grey line often marks the difference between derivative and individual claims that arise in the merger context.").

[38] *E.g., Komen*, 2020 WL 3484956, at *8; *Golaine*, 1999 WL 1271882, at *4–8; *Straight Path*, 2018 WL 3120804, at *10–12.

[39] 542 A.2d 1182 (Del. 1988).

15

rescissory damages based on fraud in the merger, where that stockholder had first filed a statutory appraisal action.[40] The Court held the stockholder's original election of an appraisal action did not deprive it of the right to file a direct claim for "fraud in the merger."[41] *Kramer v. Western Pacific Industries*,[42] decided two months later, explained *Cede* as properly focused on challenges to a merger's fairness:

> As recognized by this Court in [*Cede*], direct attacks against a given corporate transaction (attacks involving fair dealing or fair price) give complaining shareholders standing to pursue individual actions even after they are cashed-out through the effectuation of a merger. Specifically, this Court stated that "no one would assert that a former owner suing for loss of property through deception or fraud has lost standing to right the wrong that arguably caused the owner to relinquish ownership or possession of the property."[43]

*Kramer* offered a counterpoint. The *Kramer* plaintiff argued that his claim the defendants "divert[ed] to themselves" merger consideration through golden parachutes and stock options at the expense of minority stockholders was direct, not

---

[40] *Id.* at 1186.

[41] *Id.* 1188.

[42] 546 A.2d 348.

[43] *Id.* at 354 (alterations omitted) (quoting *Cede*, 542 A.2d at 1188). *Kramer* also noted the two exceptions articulated in *Lewis v. Anderson*:

> This Court, in *Lewis*, set forth two exceptions in the merger context to its holding that only a current shareholder has standing to maintain an action that is derivative in nature: (i) if the merger itself is the subject of a claim of fraud, being perpetrated merely to deprive shareholders of the standing to bring a derivative action; or (ii) if the merger is in reality merely a reorganization which does not affect plaintiff's ownership in the business enterprise.

*Id.* (citing *Lewis*, 477 A.2d at 1046 n.10).

derivative.[44]  He did not challenge "the fairness of the price offered in the merger or the manner in which the merger agreement was negotiated," or "allege that the merger price was unfair or that the merger was obtained through unfair dealing."[45] Rather:

> His principal contention for sustaining an individual, as distinguished from a derivative, claim is that the effect of the defendants' acts of waste was to reduce the common shareholders' net distributive share of an otherwise adequate tender offer price paid by [the acquirer] for taking [the target] private.[46]

Our Supreme Court characterized that claim as one of "mismanagement resulting in corporate waste," which, "if proven, represents a direct wrong to the corporation," felt only indirectly by its stockholders.[47]  On that basis, *Kramer* concluded such a claim was derivative and dismissed it because after the merger, the plaintiff lacked standing.

A decade later in *Parnes*, our Supreme Court preserved direct standing for former target stockholders attacking the fairness of a merger by attacking a side transaction.[48]  To state such a direct claim, "a stockholder must challenge the validity

_____

[44] *Id.* at 350.

[45] *Parnes*, 722 A.2d at 1245 (discussing *Kramer*); *see also Kramer*, 546 A.2d at 350 n.2, 354.

[46] *Kramer*, 546 A.2d at 350 n.2.

[47] *Id.* at 353.

[48] 722 A.2d at 1245–6.

*Parnes* was decided before *Tooley* and its elimination of the special injury test.  But the *Tooley* Court viewed *Parnes* favorably, noting "[t]he proper analysis has been and

17

of the merger itself, usually by charging the directors with breaches of fiduciary duty resulting in unfair dealing and/or unfair price."[49]  *Parnes* relied on *Kramer* to distinguish a "derivative claim for mismanagement related to a merger" from a "direct claim for unfairness in the merger terms."[50]  The *Parnes* plaintiff claimed the target company's chairman, who controlled the merger negotiations, insisted on a series of side payments in exchange for his support of any potential merger transaction.[51]  He made his demands known to all potential acquirers, potentially driving away superior bids.[52]  The Court reasoned the plaintiff adequately alleged that (1) the chairman "breached his fiduciary duty of loyalty by preferring himself over [the target company] and its stockholders," and (2) the other directors breached

---

should remain that stated in [*Grimes v. Donald*,] *Kramer* and *Parnes*. That is, a court should look to the nature of the wrong and to whom the relief should go." *Tooley*, 845 A.2d at 1039. The Delaware Supreme Court's most recent decision on this subject, *Brookfield Asset Management, Inc. v. Rosson*, which overruled *Gentile v. Rossette*, twice quoted this excerpt from *Tooley* and left *Parnes* in place. *See Brookfield*, 261 A.3d at 1264 n.48, 1273 (quoting *Tooley*, 845 A.2d at 1039); *see also El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, 152 A.3d 1248, 1251 (Del. 2016) ("Under our law, equity holders confronted by a merger in which derivative claims will pass to the buyer have the right to challenge the merger itself as a breach of the duties they are owed." (citing *Parnes*, 722 A.2d at 1245)).

[49] *Parnes*, 722 A.2d at 1245 (citing *Kramer*, 546 A.2d at 354, and *Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del. 1983)); *see also Feldman*, 951 A.2d at 734–35 ("In *Kramer*, our analysis recognized that claims of mismanagement resulting in a decrease in the value of corporate stock are derivative in nature, while 'attacks involving fair dealing or fair price' in a corporate transaction are direct in nature." (quoting *Kramer*, 546 A.2d at 354)).

[50] *Parnes*, 722 A.2d at 1245 (citing *Kramer*, 546 A.2d at 351–54).

[51] *See id.* at 1245–46.

[52] *See id.*

their duties of loyalty by "acquiescing in [the chairman's] self-interested negotiations and by approving a merger at an unfair price."[53]  On that basis, *Parnes* concluded the plaintiff challenged the fairness of the merger's process and price, and so stated a direct claim.[54]  Our Supreme Court recently discussed the difference between *Parnes* and *Kramer*:

> Although the [*Kramer*] plaintiff alleged that wrongful transactions associated with the merger reduced the amount paid to the target's stockholders, "it did not allege that the merger price was unfair or that the merger was obtained through unfair dealing."  That "such a claim is asserted in the context of a merger does not change its fundamental nature."  Thus, in *Kramer* what the plaintiff failed to plead was a challenge to the merger itself rather than attack the side benefits secured by some merger participants.[55]

In short, the *Parnes* plaintiff succeeded where the *Kramer* plaintiff did not because the *Parnes* claim attacked both the side benefits and the fairness of the merger itself.

I review *Parnes* and its progeny for guidance in identifying direct attacks on a merger through side transactions, recognizing that "Delaware Courts have

---

[53] *Id.* at 1246.

[54] *See id.* at 1245–46; *see also Brookfield*, 261 A.3d at 1272 ("Then came our decision in [*Parnes*], where the plaintiff alleged that the Chairman and CEO of Bally wrongfully required that corporate assets be transferred to him in order to obtain his consent in proceeding with a merger.  This Court concluded that such allegations directly challenged the fairness of the process and the price in the merger." (footnotes omitted) (citing *Parnes*, 722 A.2d at 1245)).

[55] *Morris v. Spectra Energy P'rs (DE) GP, LP*, 246 A.3d 121, 132 (Del. 2021) (footnotes omitted) (quoting *Parnes*, 722 A.2d at 1245).

interpreted the *Parnes* exception very narrowly."[56] First, shortly after *Parnes*, then-Vice Chancellor Strine offered guidance on the distinction between an attack on merger fairness and a peripheral attack in *Golaine v. Edwards*.[57] The *Golaine* plaintiff challenged a $20 million fee payment to KKR, a major target company stockholder.[58] The Court made three critical factual observations as to why this payment did not affect the merger's fairness, which support three gating principles for direct attacks on side transactions.[59]

First, the $20 million payment was immaterial in the context of the $8.3 billion merger; even if that payment was wrongfully directed to KKR, its absence did not

---

[56] *In re NYMEX S'holder Litig.*, 2009 WL 3206051, at *10 (Del. Ch. Sept. 30, 2009).

[57] 1999 WL 1271882, at *4 (noting that "side transactions" with large stockholders are common in the merger context).

[58] *Id.* at *1.

[59] *See Golaine*, 1999 WL 1271882, at *78; *see also Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618, 662 (Del. Ch. 2013) ("[In *Golaine*,] Chancellor Strine held that under *Kramer* and *Parnes*, a plaintiff only can state an individual claim if the complaint pleads that the side payments gave rise to a pleadings stage inference that the merger consideration was unfair."), *abrogated on other grounds by El Paso*, 152 A.3d at 1264.

affect the merger price's fairness.[60]  A claim for diverted merger consideration must challenge a material amount to be direct.[61]

Second, the payment to KKR did not come out of stockholders' pockets, but rather increased the acquiror's total acquisition costs.[62]  "[I]f plaintiffs fail to allege facts that convince the court that the side transactions rendered the underlying [merger] unfair to the target's stockholders and instead simply allege that the acquiror's cost of acquisition was made higher, the plaintiffs fail to state an individual claim."[63]

---

[60] *See Golaine*, 1999 WL 1271882, at *7–8 ("Distilled to its essence, the complaint alleges that KKR received additional merger consideration of $20 million that should have been shared with [target's] other stockholders.  If the $20 million had been shared in this fashion, [target] shareholders would have received [0].906179, rather than [0].904, of a[n] [acquiror's] share, for each of their [target] shares . . . This equals 2/10 of 1% of the total merger consideration received by the non-KKR stockholders of [target].  At the outset, therefore, let me express my doubt that the $20 million fee wagged the $8.3 billion merger dog.  The $20 million seems quite immaterial in the scheme of things.  The allegations of the complaint do little to persuade me otherwise.").

[61] *E.g.*, *id.*; *Dieterich v. Harrer*, 857 A.2d 1017, 1027 (Del. Ch. 2004) ("Further, as Vice Chancellor Strine noted in [*Golaine*], *Parnes* simply means that a shareholder makes a direct claim by alleging that director conduct in a transaction that eliminates shareholders is so egregious as to materially affect the price paid in that transaction." (footnote omitted)).

[62] *Golaine*, 1999 WL 1271882, at *9 ("Under the facts pled in the complaint, the only party that seems to have been adversely affected by the deal in real terms is [the acquiror].  Under our case law, the claim is therefore at best a derivative one alleging that [the target] became $20 million less valuable upon the payment to KKR, a claim that no one likely has standing to raise.").

[63] *Id.* at *5.

Third, consideration-diminishing side payments must be "improper" to be actionable in a direct claim.[64] But distinguishing side payments that "improperly" divert merger proceeds and thus taint the merger's fairness from "proper" diversions of merger proceeds is a strange exercise. Surely every plaintiff would contend that any diversion of merger consideration to an insider is improper. *Golaine* offered an illustration that bears repeating:

> It cannot be that the mere fact that an insider (or the affiliate of an insider) received a payment in connection with the merger in itself provides a sufficient basis for a target stockholder plaintiff to state an individual claim based on the simple syllogism that:
>
> 1. the payment was part of the total consideration the acquiror was willing to pay;
> 2. the target board had a duty to ensure that the payment's worth was spread equally to all the stockholders; and
> 3. the target board's failure to do so therefore constituted unfair dealing tainting the merger.
>
> This syllogism is nearly identical to the principal argument advanced by the plaintiff in *Kramer*. . . . The Court emphatically rejected this argument, which was premised in part on the payment of eighteen million dollars of allegedly excessive or unnecessary merger fees and expenses.
>
> Under *Parnes* and *Kramer*, the target stockholder plaintiff must, at the very least, **allege facts showing that the side payment improperly diverted proceeds that would have, if the defendant directors had acted properly, ended up in the consideration paid to the target stockholders**.[65]

---

[64] *Id.* at *7, *9; *see also NYMEX*, 2009 WL 3206051, at *10 (discussing *Parnes*).

[65] *Golaine*, 1999 WL 1271882, at *9 (footnotes and alterations omitted) (emphasis added); *accord Houseman v. Sagerman*, 2014 WL 1600724, at *13 (Del. Ch. Apr. 16, 2014) ("To

*Golaine* observed that this distinction turns, in large part, on the merits of a plaintiff's underlying breach of fiduciary duty claim: "The analysis of whether such side transactions tainted the fairness of the transaction to the target stockholders becomes in large measure a judgment about whether it was appropriate or not for those side transactions to occur."[66] Thus, "*Parnes* can be straightforwardly read as stating the following basic proposition: a target company stockholder cannot state a claim for breach of fiduciary duty in the merger context unless he adequately pleads that the merger terms were tainted by unfair dealing."[67]

I read *Golaine* to offer three ways in which a side transaction must differ from its syllogism in order for an attack on the transaction to constitute a direct attack on the merger's fairness.[68] The side transaction must divert assets stockholders were

survive a motion for judgment on the pleadings, the plaintiff must plead facts supporting an inference that the side payment represented an *improper* diversion and that, absent the impropriety, the consideration would have gone to the stockholders: such a pleading states a direct claim against the defendant directors.").

[66] *Golaine*, 1999 WL 1271882, at *6.

[67] *Id.* at *7.

[68] *See id.* at *6–9; *see also Straight Path*, 2018 WL 3120804, at *10 ("The difficulty lies in distinguishing between challenges to the merger itself and challenges to mere wrongs associated with the merger. The former state direct claims; the latter, if sufficiently remote from the merger itself, give rise to derivative claims, which target stockholders typically cannot pursue post-merger." (footnotes and internal quotation marks omitted) (quoting *Parnes*, 722 A.2d at 1245)).

otherwise going to receive.[69]  The side transaction's effect on the merger's price or process[70] must be material, so as to have affected the merger's fairness.[71]  And the diversion must be "improper," as gauged under essentially a merits inquiry, turning on whether the side transaction was a product of misconduct like a breach of fiduciary duty.[72]  Merely "mentioning a merger in the complaint does not talismanically create a direct action.  Instead, there must be a causal link between the breach complained of and the ultimate unfairness of the merger."[73]

Three recent cases applied *Golaine*'s indicia of an attack on merger fairness via a side transaction, searching for a material, improper diversion of merger

---

[69] *See, e.g.*, *Golaine*, 1999 WL 1271882, at *9 (noting that the alleged side transaction did not "[take] anything off the table that would have otherwise gone to all the [target] stockholders.").

[70] After *Parnes* and *Golaine*, this Court wondered aloud "whether an individual claim could exist only if the process were so unfair as to have resulted in an unfair price," or whether an unfair process (resulting in a sub-market but perhaps still fair price) could support a direct claim under *Parnes*. *In re Ply Gem Indus., Inc. S'holders Litig.*, 2001 WL 755133, at *5 (Del. Ch. June 26, 2001); *see also Carsanaro*, 65 A.3d at 663 (discussing *Golaine* and *Ply Gem*).  Noting that *Parnes* discussed "unfair price *and/or* unfair process," the Court in *Ply Gem* suggested unfair process alone was enough.  *See Ply Gem*, 2001 WL 755133, at *5 (citing *Parnes*, 722 A.2d at 1245).  "I need not attempt to resolve this dispute because under *Golaine*'s more restrictive view, the [Amendments] diverted a sufficient quantum of merger proceeds to support an inference that the consideration was unfair to the holders of common stock."  *Carsanaro*, 65 A.3d at 663.

[71] *See, e.g.*, *Golaine*, 1999 WL 1271882, at *8.

[72] *See id.* at *6–7 (discussing *Parnes*); *see also Houseman*, 2014 WL 1600724, at *13.

[73] *NYMEX*, 2009 WL 3206051, at *10 (footnotes, alterations, and internal quotation marks omitted) (quoting *Dieterich*, 857 A.2d at 1027).

consideration from target stockholders. In *Houseman v. Sagerman*[74] and *In re Straight Path Communications Inc. Consolidated Stockholder Litigation*,[75] the plaintiff successfully stated a direct claim. *Brokerage Jamie Goldenberg Komen Rev Tru U/A 06/10/08 Jamie L Komen Trustee for the Benefit of Komen v. Breyer* dismissed the plaintiff's claim as derivative.[76]

In *Houseman*, the challenged side transaction was the target board's amendment of its stock option plan "to treat stock options as common stock upon a change in control, and to vest warrants which would otherwise have lapsed."[77] In doing so, the target's board "divert[ed] to directors over $300,000 (and perhaps significantly more) of the previously-negotiated merger consideration."[78] The board decided to enter into the allegedly self-dealing side transaction after the merger price had been fixed, so "the extracted payments necessarily came at the expense of other [target] stockholders," calling the fairness of the merger consideration into question.[79] Both the underlying warrants and their renegotiation "arose in a context

---

[74] 2014 WL 1600724.

[75] 2018 WL 3120804.

[76] 2020 WL 3484956.

[77] 2014 WL 1600724, at *13.

[78] *Id.*

[79] *Komen*, 2020 WL 3484956, at *12 (discussing *Houseman*); *see also Houseman*, 2014 WL 1600724, at *13 ("The facts pled include the facts that, *after* negotiating the sale price, the Board amended the 2008 Equity Incentive Plan to treat stock options as common stock upon a change in control, and to vest warrants which would otherwise have lapsed, diverting to directors over $300,000 (and perhaps significantly more) of the previously-

which constituted self-dealing," thus "conferring a benefit on the directors not shared by the stockholders."[80]   And the diversion, constituting at least $300,000 in value, was material in the context of a small merger where the target board could not justify spending $250,000 on a fairness opinion.[81]   Therefore, the claim was direct.[82]

Years later in *Straight Path*, this Court considered a claim that the target's controller used his leverage to extract a nonratable benefit in a side transaction.  The controller threatened to block the pending merger unless the target agreed to settle indemnification claims against one of his affiliates for pennies on the dollar.[83]   If successfully pursued, those indemnification claims would have made up for a penalty of twenty percent of the merger consideration owed to regulators.[84]   The controller also bought some of the company's assets for approximately one-tenth of their value, preventing that value from being realized in an arm's-length merger.[85]  The Court found the controller "manipulated the sales process" and "improperly

---

negotiated merger consideration, in the context of total merger consideration so small that the Board concluded that a fairness opinion costing $250,000 could not be justified." (footnote omitted)).  The improper side transaction's timing vis-à-vis the merger has been a consideration in other *Parnes* cases.  *See, e.g.*, *NYMEX*, 2009 WL 3206051, at *10–11 (citing *Dieterich*, 857 A.2d at 1029).

[80] *Houseman*, 2014 WL 1600724, at *13.

[81] *Id.*

[82] *Id.*

[83] *Straight Path*, 2018 WL 3120804, at *12.

[84] *Id.* at *13.

[85] *Id.* at *7.

diverted merger consideration that otherwise would have gone to the stockholders"

to the controller, effectively depriving the company's stockholders of half a billion

dollars of merger consideration in a $3.1 billion merger.[86]  The Court concluded

plaintiffs stated a direct claim.[87]  Vice Chancellor Glasscock certified his conclusion

for interlocutory appeal, noting the plaintiff's claim challenged the total merger

consideration target stockholders received, but not the sufficiency of the merger

---

[86] *Id.* at *13.

[87] *Id.* at *12–13; *see also id.* at *1 ("Here, the indemnification right did not fully ripen until the sale, and the leverage used by the controller included a threat to nix the transaction unless corporate assets were first transferred to his affiliates for a manifestly unfair price, but for which the consideration received by the stockholders upon sale would have included both the price paid by the purchaser and the beneficial ownership of the litigation trust.  I find the transfer of the indemnification claim to the controller here to be sufficiently intertwined with the sale of the company and the assets received by stockholders therefrom to state a claim that the sales transaction was unfair.  That claim is direct and may proceed.").

price itself.[88]  Despite this distinction, the Delaware Supreme Court summarily affirmed his decision.[89]

*Houseman* and *Straight Path* stand in contrast to this Court's recent decision in *Komen*.  There, the challenged side transaction was the target board's compensation committee's decision to issue "performance awards" and restricted stock units to several insiders, including top executives.[90]  The plaintiff alleged that transaction swamped existing stockholders and their right to merger consideration.[91]

---

[88] *In re Straight Path Commc'ns Inc. Consol. S'holder Litig.* (*Straight Path II*), 2018 WL 3599809, at *2 (Del. Ch. July 26, 2018).  Specifically:

> The question presented . . . involves whether a challenge to a sale of corporate assets to a controller for an unfair price, upon which the controller conditions consent to a merger, states a direct claim under [*Parnes*] and its progeny.  Under *Parnes*, a stockholder who directly attacks the fairness or validity of a merger alleges an injury to the stockholders, not the corporation, and may pursue such a claim even after the merger at issue has been consummated.  Unlike in *Parnes* itself, however, here there was no challenge to the merger price as such; the challenged sale upon which the merger was conditioned removed corporate assets that would otherwise have been withheld from the merger sale and transferred to a trust for the benefit of the stockholders.  As a result, ***the total consideration received by the stockholders post-merger was decreased by the challenged sale, but the merger price itself was not affected, and was not challenged by the Plaintiffs***.  This precise question has not been directly addressed by prior case law.

*Id.* (footnotes, alterations, and internal quotation marks omitted) (emphasis added) (quoting *Parnes*, 722 A.2d at 1245).

[89] *See IDT*, 206 A.3d at 260 (TABLE).

[90] *Komen*, 2020 WL 3484956, at *10 (internal quotation marks omitted).

[91] *See id.* ("According to Plaintiff, if the [controller] did not extract this benefit for themselves, the consideration paid by [buyer] would have been shared by fewer Old Fox

28

The *Komen* Court concluded the plaintiff's claim "basically boils down to the [*Golaine*] syllogism," and that it was derivative for want of its impact on the merger's fairness.[92] Its "critical deficiency" was "the lack of any factual allegations suggesting a causal link between the [executives'] receipt of the challenged compensation awards and any unfair dealing in negotiating the terms of the [merger]."[93] Unlike *Straight Path* (or *Parnes*), *Komen* presented no allegation that the executives "refused to negotiate or impeded the negotiation of a transaction unless and/or until they received the challenged stock awards."[94] Though the *Komen* plaintiff criticized the process leading up to the compensation committee's decision, it did not challenge the merger negotiations or allege that the side transaction impacted those talks.[95]

The *Komen* plaintiff's claim was also derivative because the awards were immaterial, as in *Golaine* but in contrast to *Straight Path*, *Parnes*, and *Houseman*.[96] The challenged compensation awards were worth $82.4 million—approximately

---

shares and the ownership of New Fox would have been split fewer ways." (alterations and internal quotation marks omitted)).

[92] *Id.* at *11–12.

[93] *Id.* at *11.

[94] *Id.* at *12.

[95] *See id.* at *11–12 (citing *Golaine*, 1999 WL 1271882, at *9).

[96] *Id.* *12.

one-tenth of one percent of the total merger consideration.[97]  Concluding that the side transaction did not "support the notion that Defendants tainted the sale process or the negotiations of the [merger] such that they caused anything to be taken off the table that otherwise would have gone to all of [the target's] stockholders," the *Komen* Court held the plaintiff's claims were derivative.[98]

***

In sum, the rule statement from *Parnes* remains perhaps the rule's best formulation:  a target stockholder retains direct standing after a merger has closed to challenge the fairness or validity of the merger itself.  Where a stockholder challenges a merger by attacking a side transaction, the Court remains focused on merger fairness.  The Court must distinguish between direct challenges to a merger's fairness and derivative challenges to wrongs merely associated with the merger. *Golaine*, as applied in *Houseman*, *Straight Path*, and *Komen*, instructs that to be direct, the side transaction must divert merger consideration from stockholders, rather than from the acquirer; the diversion must be "improper," that is, the product of misconduct by the defendants; and the diversion must materially affect the merger's process or price, calling the merger's fairness or validity into question.

---

[97] *Id.*

[98] *Id.* at *13.

## 2. Count I's Breach Of Fiduciary Duty Claim Is Direct.

With this rule in mind, I consider whether Plaintiffs' breach of fiduciary duty claim is direct or derivative. In my judgment, it is direct.

"[A]lthough not a model of clarity"[99] on all the details, Plaintiffs' allegations challenge the Merger's fairness, following the trail blazed in *Golaine* as applied in *Houseman* and *Straight Path*. Plaintiffs allege the Board's decision to approve the Amendments diverted merger proceeds to a controller in a way that tainted the merger's fairness and materially reduced the merger consideration for Left Coast's other stockholders. The Complaint explains that after Merger negotiations were substantially complete, Fireman Capital threatened to derail the deal and withhold its approval unless the Board agreed to its demanded Amendments.[100] Those threats had teeth: the Class B Proxy gave Fireman Capital enough voting power to block the Merger.[101] And if the Merger did not happen by November 30, the Company would owe Fireman Capital substantially more cash and stock under the 2020 Note and the 2020 Warrants.[102] To close the Merger and enjoy more palatable repayment

---

[99] *Parnes*, 722 A.2d at 1245.

[100] *See* Compl. ¶ 37.

[101] *See id.* ¶ 7; *see also id.* ¶¶ 17, 24, 37.

[102] *See id.* ¶¶ 27–31.

terms, the Company had to agree to Fireman Capital's demands.[103] The Board gave in, diverting approximately $40 million in Merger consideration to Fireman Capital and the other Defendants.[104] These allegations allege improper diversion of material merger consideration that stockholders would otherwise enjoy, and so, challenge the Merger's fairness and allege a direct claim.

First, the parties do not seriously dispute that Fireman Capital's alleged leveraging of its power to block the Merger to extract a unique benefit, or the Board's accession to those demands, was improper. As alleged, Fireman Capital, the proverbial "800-pound gorilla,"[105] hijacked Merger negotiations and threatened to block the Merger unless the Board approved its favorable Amendments.[106] In other words, Fireman Capital was able to wield its influence to extract a benefit for itself

---

[103] *See id.* ¶¶ 38–39.

[104] *Id.* ¶ 40. It is not entirely clear to me how this diversion occurred. But I accept Plaintiffs' allegation as true, as I must at this early stage.

[105] *See In re Pure Res., S'holders Litig.*, 808 A.2d 421, 436 (Del. Ch. 2002). Plaintiffs have adequately alleged Fireman Capital is a controller. *See infra* Section II.B.

[106] *See* Compl. ¶¶ 34–41.

Fueled entirely by documents outside the Complaint, the Moving Defendants spilled substantial ink arguing the purpose of the Amendments was to "remedy certain inconsistencies in the documentation of the [July 2020 Financing]." *See* OB 12. Plaintiffs have alleged otherwise. At this procedural stage, I cannot weigh evidence to choose between Plaintiffs' well-pleaded allegations and the Moving Defendants' alternative explanation for the Amendments. *See, e.g., CBS*, 2021 WL 268779, at *18 (quoting *Voigt v. Metcalf*, 2020 WL 614999, at *9 (Del. Ch. Feb. 10, 2020)). The Moving Defendants' argument that the Amendments were nothing more than "a good faith effort to remedy inconsistencies in the July 2020 instruments" is for another day. RB 11 n.4.

at the expense of Left Coast's stockholders.[107] That Fireman Capital did not actually use its Class B Proxy to block the Merger does not mean its threats to do so are not improper. *Straight Path* recognized "that a controller's right to refuse to support a transaction does not imply a right to exploit minority stockholders" and that a controller's threats to block a merger unless it received a special benefit are actionable as breaches of fiduciary duty.[108] Plaintiffs also allege a majority of the Board was aligned with Fireman, and that the minority independent directors could not say "no."[109]

This misconduct surrounding the Amendments was intertwined with the Merger: Fireman Capital threatened to withhold its proxy, effectively derailing the deal, unless and until the Company acceded to its demands. These threats are reminiscent of those in *Parnes* and *Straight Path*, in which threatening the merger process linked the side transaction with the merger transaction.

Next, the parties do not dispute that the diversion via the Amendments was material.[110] Plaintiffs repeatedly allege the Amendments diverted $40 million in

---

[107] *See* Compl. ¶¶ 34–41.

[108] 2018 WL 3120804, at *16 (discussing *In re Delphi Fin. Gp. S'holder Litig.*, 2012 WL 729232 (Del. Ch. Mar. 6, 2012)).

[109] Compl. ¶¶ 38–39.

[110] *See generally* OB; RB.

Merger consideration from the stockholders' pockets and into Fireman Capital's.[111] The parties appear to agree the Merger consideration's value was in the range of $120 million to $130 million.[112] Subversive Capital's prospectus offered consistent numbers.[113] A $40 million diversion is material to a transaction of that size.[114] This material diversion stands in stark contrast to the immaterial side transactions in *Golaine* and *Komen*, both of which represented less than one percent of the overall merger consideration.[115] "The [P]laintiffs are entitled to an inference that the

---

[111] Compl. ¶¶ 1, 3, 40.

[112] *Compare* AB 29–30 (stating the $40 million diversion accounted for one-third of the Merger's consideration), *and* Hr'g Tr. 58–59 (same), *with* D.I. OB 12 (suggesting Merger consideration could reach as high as $130.9 million, subject to certain adjustments).

[113] That prospectus describes the aggregate consideration going to Left Coast as follows:

> [(1)] a number of Common Shares . . . equal to (i) $142,138,712 (subject to certain adjustments and holdbacks) less the amount of the SISU Consideration (defined below) divided by (ii) $10.00; and

> [(2)] a contingent right for up to an additional 3,856,955 Common Shares (the "LCV Trading Price Consideration Shares") of which: (i) one-third (1/3) will be payable if the 20-Day VWAP is equal to or exceeds $13.00, (ii) an additional one-third (1/3) will be payable if the 20-Day VWAP is equal to or exceeds $17.00 and (iii) an additional one-third (1/3) will be payable if the 20-Day VWAP is equal to or exceeds $21.00, in each case during the three-year period after Closing.

Stachel Decl. Ex. 1 at 38–39. The "SISU Consideration" is later defined as $76,246,594, also "subject to certain adjustments and holdbacks." *Id.* at 40.

[114] *See Straight Path*, 2018 WL 3120804, at *12, 15 (noting the effect of selling the indemnification claim had "the effect of depriving stockholders of *one-fifth* of the merger consideration," and that this amount was material).

[115] *Golaine*, 1999 WL 1271882, at *8 ("At the outset, therefore, let me express my doubt that the $20 million fee wagged the $8.3 *billion* merger dog. The $20 million seems quite immaterial in the scheme of things."); *Komen*, 2020 WL 3484956, at *12 ("According to the Complaint, the challenged compensation awards were worth an $82.4 million to the

[Amendments] diverted a material amount of consideration, giving them standing to sue individually."[116]

Finally, the Amendments' timing vis-à-vis the Merger negotiations indicates the diverted consideration would have otherwise gone into stockholders' pockets, calling the Merger's fairness into question.[117] Thus, unlike in *Golaine*, the Complaint does not "simply allege that the acquiror's cost of acquisition was made higher," but instead conceivably asserts that the Amendments "rendered the underlying [Merger] unfair to [Left Coast's] stockholders."[118] This is so even without a facial challenge to the overall Merger price, as clarified in *Straight Path*.[119]

The Moving Defendants attempt to avoid these indicia of a direct attack on merger fairness by pointing to irrelevant factual similarities with *Komen*, and distinctions from *Straight Path* and *Houseman*.[120] These efforts are unavailing. First, in *Komen*, the Court noted that the challenged transaction did not solely benefit the executive recipients, distinguishing it from other *Parnes* cases where all the side

---

[executives]. That is a whole lot of money to just about anybody, but it represents just about 1/10th of 1 percent of the $71.3 billion of consideration the [target] stockholders received in the Disney Merger." (footnote omitted)).

[116] *Carsanaro*, 65 A.3d at 665.

[117] *See Houseman*, 2014 WL 1600724, at *13; *Komen*, 2020 WL 3484956, at *12.

[118] *See* 1999 WL 1271882, at *5.

[119] *See* 2018 WL 3120804, *13 n.187.

[120] *See* RB 9–12.

35

transaction's benefit went to the defendants.[121]  In *Komen*, this fact suggested the challenged compensation changes were innocuous and simply "among those 'countless issues' that legitimately would need 'to be figured out' during a sale process."[122]  In an attempt to paint the Amendments as similarly innocuous, the Moving Defendants point out the Amendments benefited all the creditors holding 2019 Notes and 2020 Warrants, not just Fireman Capital.[123]  This fact does no work here.  While the Amendments benefited all those holders, they overwhelmingly benefited Fireman Capital.  It appears the Fireman Entities' interest accounted for approximately 62% of the July 2020 Financing.[124]  Most of the other money in the July 2020 Financing came from defendants Bassler and Crocket.[125]  This stands in contrast to *Komen*, where the alleged controller executives received only 26% of the challenged side transaction's benefit.[126]

The Moving Defendants also seize on the *Komen* complaint's "critical deficiency": the lack of a causal link between the challenged awards and any unfair

---

[121] *Komen*, 2020 WL 3484956, at *11.

[122] *Id.* (quoting *Golaine*, 1999 WL 1271882, at *9).

[123] *See* RB 9–10.

[124] *See* Stachel Decl. Ex. 6 at 1 (noting the Fireman Entities loaned Left Coast $6,170,671.06 of the $10,000,000 it raised in the July 2020 Financing).

[125] *See* Compl. ¶ 33.

[126] 2020 WL 3484956, at *11.

dealing in the merger itself.[127]  The *Komen* plaintiffs did not challenge the *bona fides* of the sales process leading up to the merger.[128]  The Moving Defendants point out that Plaintiffs also do not challenge the process by which the Company selected and negotiated with Subversive Capital.[129]  But this case has the same links to the Merger process *Komen* noted were absent there but present in *Parnes*, *Straight Path*, and *Houseman*.  As in *Parnes* and *Straight Path*, Plaintiffs offer "facts to support a reasonable inference that the [controller] refused to negotiate or impeded the negotiation of a transaction unless and/or until they received the challenged [benefits]."[130]  And as in *Houseman*, "the directors engaged in self-dealing to extract additional payments after the merger consideration had been fixed such that the extracted payments necessarily came at the expense of other stockholders."[131]  Fireman Capital threatened to derail the Merger at the eleventh hour unless its demands were satisfied.[132]  And this threat came after the Board approved the Merger documents and the consideration had already been fixed.

---

[127] *Id.*

[128] *Id.*

[129] *See* RB 10.

[130] *Komen*, 2020 WL 3484956, at *12 (distinguishing *Parnes* and *Straight Path*).

[131] *Id.* (distinguishing *Houseman*).

[132] *See* Compl. ¶¶ 35–39.  The Moving Defendants argue Fireman Capital's interference with the merger process was less concerning and less intrusive than the interference in *Straight Path*.  *See* RB 11.  This may be so, but *Straight Path* does not set the floor for a nexus with the merger.  Both Fireman Capital and the *Straight Path* controller explicitly "conditioned [their] support for the merger on receiving unique . . . benefits at the expense

Finally, the Moving Defendants try to distinguish *Houseman*, noting that in that case, both the original issuance of the warrants and their post-merger amendments arose from self-dealing.[133] The Moving Defendants see less impropriety here, where the original issuances of the 2019 Note and 2020 Warrants were in the ordinary course.[134] Again, this minor factual distinction is irrelevant. *Houseman* does not stand for the proposition that direct claims may only be stated against repeat or systematic offenders. *Houseman* focused on the merger-related transaction, noting that it was the second transaction that "conferr[ed] a benefit on the directors not shared by the stockholders."[135] That the self-dealing in *Houseman* also predated the merger only buttressed the conclusion that the side transaction there was improper.

In sum, Count I satisfies the *Parnes* exception for a post-merger direct claim by a former target stockholder. Plaintiffs have successfully alleged an improper side transaction intertwined with the Merger rendered the Merger itself unfair by diverting material consideration that would have otherwise gone to Left Coast's

---

of the company's minority stockholders." *See* 2018 WL 3120804, at *16. In my view, this is sufficient at this stage.

[133] *See* RB 12 (citing *Houseman*, 2014 WL 1600724, at *13).

[134] *See id.*

[135] *Houseman*, 2014 WL 1600724, at *13.

stockholders.  Because that claim calls the Merger's fairness into question, it is direct.

### 3. Count II's Tortious Interference Claim Is Direct.

Evaluating the nature of Plaintiffs' tortious interference claim is a bit easier. Though the Moving Defendants sought to dismiss the entire Complaint as deficient under *Parnes*,[136] Plaintiffs' tortious interference claim is not implicated by that line of cases.  Rather, it calls for a straightforward application of *Tooley*.  To repeat, the direct/derivative inquiry under *Tooley* turns solely on the following two questions:

(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and

(2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?[137]

Under *Tooley*, "a court should look to the nature of the wrong and to whom the relief should go."[138]

The harm complained of in Count II was suffered by the Plaintiffs as optionholders.  To show an individual harm, a plaintiff "must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation.  In other words, the stockholder's claimed

---

[136] *See* OB 17; RB 7.

[137] *Tooley*, 845 A.2d at 1033.

[138] *Id*. at 1039.

39

direct injury must be independent of any alleged injury to the corporation."[139]  Here,

Plaintiffs' claim for tortious interference implicates an individual harm, separate

from any injury to the Company itself.  In fact, it is separate from any injury they

would suffer as stockholders.  The gravamen of Count II is that Defendants'

malfeasance rendered options held by Yim and other optionholders worthless.[140]

Defendants' actions may have harmed the Company as well.  But the opportunity to

profit from the options belonged to the optionholders, not the Company.  Interfering

with that opportunity thus harmed the optionholders independently of any injury to

the Company.  Similarly, the benefit of any recovery from Count II would run to the

optionholders as individuals.  Plaintiffs seek an award of money damages to remedy

the alleged tortious interference.[141]  "They, rather than the Company, would receive

the benefit of that recovery."[142]  Thus, Plaintiffs' tortious interference claim in Count

II states a direct, rather than derivative, claim.[143]

---

[139] *In re MultiPlan Corp. S'holders Litig.*, 2022 WL 24060, at *9 (Del. Ch. Jan. 3, 2022) (alterations and internal quotation marks omitted) (quoting *Tooley*, 845 A.2d at 1039).

[140] *See* Compl. ¶ 59.

[141] *See id..* at 22.

[142] *MultiPlan*, 2022 WL 24060, at *9.

[143] Indeed, the Moving Defendants seem to acknowledge Count II states a direct claim.  *See* OB at 33 (describing Count II as a "defective attempt to turn purported derivative claims for breaches of fiduciary duty . . . into a direct tortious interference claim").

#### 4. The Conspiracy Claims In Counts III And IV Are Direct.

Because Counts I and II are direct, Plaintiffs' civil conspiracy claims in Count III and Count IV are also direct. "Civil conspiracy is not an independent cause of action; it must be predicated on an underlying wrong."[144] Here, the wrongs underlying the conspiracy claims in Counts III and IV are direct. Count III alleges Fireman Capital, Crocket, and Bassler conspired to commit the breaches of fiduciary duty complained of in Count I. Because our law casts those breaches as causing a direct harm to the Plaintiffs, a claim that other defendants participated in a conspiracy to commit them is also direct.[145] Similarly, Count IV alleges a civil conspiracy to commit the tortious interference alleged in Count II. Since the underlying harm there was to optionholders, not the Company, it follows that a conspiracy to commit that harm should also be treated as a direct claim. That Plaintiffs added additional defendants as co-conspirators does not transform an otherwise direct claim into a derivative claim.

---

[144] *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 892 (Del. Ch. 2009) (citing *Ramunno v. Cawley*, 705 A.2d 1029, 1039 (Del. 1998)).

[145] *See CMS Inv. Hldgs., LLC v. Castle*, 2015 WL 3894021, at *8 (Del. Ch. June 23, 2015) (treating a civil conspiracy claim relating to an alleged breach of fiduciary duty as direct where the underlying breach of fiduciary duty claim was direct).

## B. Plaintiffs Pled Fireman Capital Is A Controller.

Having concluded the Complaint pleads direct claims, I move next to its merits. Count I alleges that "each of the Defendants"[146] owed fiduciary duties to the Company's common stockholders: Plaintiffs contend Fireman Capital "and its affiliates" were the Company's controllers, owing fiduciary duties.[147] The Moving Defendants counter this claim by arguing both that Fireman Capital was not a controller and that the Fireman Entities, Crocket, and Bassler did not combine to form a control group.[148] Plaintiffs' answering brief did not pursue a control group theory and instead, solely argued Fireman Capital was a controller.[149] I consider only whether Plaintiffs pled that Fireman Capital, standing alone, is a controller against whom a breach of fiduciary duty claim will lie.[150] They have.

"Delaware law imposes fiduciary duties on those who effectively control a corporation."[151] The premise for contending that a controller owes fiduciary duties

---

[146] Compl. ¶ 48.

[147] *Id.* ¶ 49.

[148] *See* OB 26–28.

[149] *See* AB 18–21.

[150] Because of this crystallization over the course of briefing, and because Crocket and Bassler have not yet appeared to challenge the claims against them, this opinion does not consider the merits of any claims against Crocket and Bassler.

[151] *Voigt*, 2020 WL 614999, at *11 (internal quotation marks omitted) (quoting *Quadrant Structured Prods. Co. Ltd. v. Vertin*, 102 A.3d 155, 183–84 (Del. Ch. 2014), and citing *S. Pac. Co. v. Bogert*, 250 U.S. 483, 487–88 (1919)).

"is that the controller exerts its will over the enterprise in the manner of the board itself."[152] The controller analysis "must take into account whether the stockholder, as a practical matter, possesses a combination of stock voting power and managerial authority that enables him to control the corporation, if he so wishes."[153] This exercise regards substance over form; it does not matter whether control is exercised directly or indirectly.[154] "The question whether a shareholder is a controlling one is highly contextualized and is difficult to resolve based solely on the complaint."[155] "[T]here is no magic formula to find control; rather, it is a highly fact specific inquiry."[156]

"One method of pleading control sufficient to impose fiduciary duties is to allege that a defendant has the ability to exercise a majority of the corporation's

---

[152] *Abraham v. Emerson Radio Corp.*, 901 A.2d 751, 759 (Del. Ch. 2006).

[153] *In re Cysive, Inc. S'holders Litig.*, 836 A.2d 531, 553 (Del. Ch. 2003).

[154] *See In re Pattern Energy Gp. Inc. S'holders Litig.*, 2021 WL 1812674, at *40 (Del. Ch. May 6, 2021) (quoting *In re Ezcorp Inc. Consulting Agreement Deriv. Litig.*, 2016 WL 301245, at *9–10 (Del. Ch. Jan. 25, 2016)).

[155] *Williamson v. Cox Commc'ns, Inc.*, 2006 WL 1586375, at *6 (Del. Ch. June 5, 2006) (citing *Cysive*, 836 A.2d at 550–51); *accord In re Tesla Motors, Inc. S'holder Litig.*, 2018 WL 1560293, at *13 (Del. Ch. Mar. 28, 2018) ("Whether a large blockholder is so powerful as to have obtained the status of a 'controlling stockholder' is intensely factual and it is a difficult question to resolve on the pleadings." (alterations and internal quotation marks omitted) (quoting *Cysive*, 836 A.2d at 550–51)).

[156] *Calesa Assocs., L.P. v. Am. Cap., Ltd.*, 2016 WL 770251, at *11 (Del. Ch. Feb. 29, 2016) (citing *In re Crimson Expl. Inc. S'holder Litig.*, 2014 WL 5449419, at *10 (Del. Ch. Oct. 24, 2014)).

voting power."[157] Delaware law is well-settled that a stockholder who can exercise more than 50% of a company's voting power is a controller.[158] A majority stockholder's control flows principally from its voting power, which translates into the power to "alter materially the nature of the corporation and the public stockholders' interests."[159]

Plaintiffs argue Fireman Capital is a controller because the Class B Proxy allows it to exercise 83% of the Company's outstanding voting power.[160] The Moving Defendants concede that if Fireman Capital owned the stock associated with the Class B Proxy, it would be a controlling stockholder.[161] The Moving Defendants try to cast Fireman Capital more as a creditor than as a stockholder. They cite *Hamilton Partners, L.P. v. Highland Capital Management, L.P.*[162] for the proposition that "[i]n contrast to a controlling stockholder, a corporation's creditor— even one that owns a majority of the corporation's debt—does not owe fiduciary duties to stockholders."[163] But Fireman Capital holds both debt and the Class B

---

[157] *Voigt*, 2020 WL 614999, at *11 (compiling sources).

[158] *See id.*; *see also In re KKR Fin. Hldgs. LLC S'holder Litig.*, 101 A.3d 980, 991 (Del. Ch. 2014), *aff'd sub nom. Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304 (Del. 2015).

[159] *Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 43 (Del. 1994).

[160] AB 19–20. Two Fireman Capital partners also sat on the Company's Board. *See* Compl. ¶¶ 8, 9, 32.

[161] *See* Hr'g Tr. 37.

[162] 2014 WL 1813340 (Del. Ch. May 7, 2014).

[163] *Id.* at *13; *see* OB 24.

44

Proxy. The fact that it secured that voting power via its creditor-debtor relationship with the Company is inconsequential. Fireman Capital has control because it can vote most of the Company's stock, not because it holds most of the Company's debt.

The Moving Defendants also contend Fireman Capital cannot be a controller because it is not a stockholder.[164] As an initial matter, Plaintiffs point to two allegations in the Complaint that describe Fireman Capital as the Company's "controlling stockholder."[165] This allegation is plainly conclusory as to the "controlling" description, and Plaintiffs could have pled facts supporting Fireman Capital's status as a stockholder. But at bottom, I take Plaintiffs' allegation that Fireman Capital is a stockholder as true for purposes of this opinion.

And whether Fireman Capital owns any or all of the stock it can vote is of no moment. It is true that stock ownership is the traditional vehicle through which outsiders gain voting power.[166] But holding stock is not a prerequisite to exercising voting control that carries the weight of fiduciary duties. The United States Supreme Court has recognized that a nonstockholder which exercises control over a

---

[164] *See* OB 24–25.

[165] *See* AB 19 (citing Compl. ¶¶ 1, 7). Plaintiffs also attach an information statement describing the Merger that indicates Fireman Capital "holds 2,803,809 [Company] Class A Shares" through an affiliate called "Red Barn Holdco LLC." *See* AB 20 n. 73 (quoting AB Ex. A at A-27). This document was not incorporated by reference by the Complaint, but Plaintiffs urge me to take judicial notice of it anyway. *See id.* I do not need to reach that issue here.

[166] *See, e.g.*, *Pattern Energy*, 2021 WL 1812674, at *37.

corporation through a subsidiary that controls the majority of the corporation's voting power is itself a controller.[167] Fireman Capital's Class B Proxy gives it the "ability to exercise a majority of the corporation's voting power."[168] Based on that fact alone, Fireman Capital is a controller. To hold otherwise would elevate form over substance.[169] And so, Plaintiffs have pled Fireman Capital is a controller owing fiduciary duties alongside the Director Defendants.

The next step is to consider whether Plaintiffs have pled the Company's fiduciaries breached their duties.[170] The Moving Defendants have not meaningfully

---

[167] *See S. Pac. Co.*, 250 U.S. at 491–92 (noting the control doctrine "does not rest upon such technical distinctions").

[168] *See Voigt*, 2020 WL 614999, at *11.

[169] The Moving Defendants rightly equate control of the Class B shares to control of the Company: they asserted the Company's founders, Groh, Blue, and Kennedy, "unquestionably controlled the company" before issuing the Class B Proxy because "[t]hey owned all of Left Coast's high vote Class B shares." Hr'g Tr. 7–8. It stretches reason to argue that Fireman Capital, which holds the same power to vote the founders' controlling voting interest, is not a controller simply because it owns less stock or none at all.

Indeed, the Moving Defendants' logic acknowledges that voting control does not always track stock ownership. Despite controlling most of the Company's voting power, the founders do not own most of the Company's shares. *See* Compl. ¶ 16. Suppose one entity owned Left Coast's Class A shares, and another owned its Class B shares. The Class B entity would "unquestionably" control the Company because it controlled 83% of the voting power, despite holding only 32.99% of the shares. But the Class A entity, despite owning the vast majority of the Company's shares, could hardly be said to control it. Our law rightfully regards voting power, not economic ownership, as the meaningful source of control.

[170] In view of Plaintiffs' theory of the case, I pause to note this is a different exercise than setting the standard of review.

46

disputed that they have.[171]  "A controlling stockholder owes fiduciary duties to the corporation and its minority stockholders, and it is prohibited from exercising corporate power (either formally as directors or officers or informally through control over officers and directors) so as to advantage itself while disadvantaging the corporation."[172]  "The purpose of controlling stockholder liability is to make sure that controlling stockholders do not use their control to reap improper gains through unfair self dealing or other disloyal acts."[173]  Plaintiffs have pled breaches in the Director Defendants' decision to approve the Amendments and in Fireman Capital's

---

When determining whether corporate fiduciaries have breached their duties, Delaware corporate law distinguishes between the standard of conduct and the standard of review.  The standard of conduct describes what directors are expected to do and is defined by the content of the duties of loyalty and care.  The standard of review is the test that a court applies when evaluating whether directors have met the standard of conduct.

*Chen v. Howard-Anderson*, 87 A.3d 648, 666 (Del. Ch. 2014) (footnotes and internal quotation marks omitted) (compiling academic sources, then quoting *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 35–36 (Del. Ch. 2013)).

[171] *Compare* OB 31–32 ("Plaintiffs' breach of fiduciary duty claim (Count I) further fails as to the Fireman Entities because Plaintiffs fail to allege they were controlling stockholders or members of a control group."), *with* RB 13–17 (arguing "Count I fails to state a claim for breach of fiduciary duty as to the Fireman Entities").  "Normally, this court does not entertain arguments raised for the first time in a reply brief."  *Pryor v. IAC/InterActiveCorp.*, 2012 WL 2046827, at *6 n.71 (Del. Ch. June 7, 2012).

[172] *Carr v. New Enter. Assocs., Inc.*, 2018 WL 1472336, at *22 (Del. Ch. Mar. 26, 2018) (alterations, emphasis, and internal quotation marks omitted) (quoting *Thorpe v. Cerbco, Inc.*, 1995 WL 478954, at *8 (Del. Ch. Aug. 9, 1995), *aff'd in part, rev'd in part* 676 A.2d 436 (Del. 1996)).

[173] *Shandler v. DLJ Merch. Banking, Inc.*, 2010 WL 2929654, at *16 (Del. Ch. July 26, 2010).

role in causing the Amendments to be approved, as I explained above in finding these actions to be improper for purposes of *Parnes*.[174]

Fireman Capital's procurement of the Amendments triggers entire fairness review. The business judgment rule's protection is rebutted when a controller engages in a conflicted transaction.

> Conflicted transactions include those in which the controller stands on both sides of the deal (for example, when a parent acquires its subsidiary), as well as those in which the controller stands on only one side of the deal but competes with the common stockholders for consideration. In either circumstance, entire fairness review will apply *ab initio*.[175]

This Court has identified three examples of conflicted transactions where the controller competes with common stockholders for consideration:

> (1) where the controller receives greater monetary consideration for its shares than the minority stockholders; (2) where the controller takes a different form of consideration than the minority stockholders; and (3) where the controller gets a unique benefit by extracting something uniquely valuable to the controller, even if the controller nominally receives the same consideration as all other stockholders. [176]

Here, as in *Straight Path*, Fireman Capital competed with Left Coast's common stockholders by extracting a different benefit (the Amendments) out of the Merger

---

[174] *See supra* Section II.A.2.

[175] *Larkin v. Shah*, 2016 WL 4485447, at *8 (Del. Ch. Aug. 25, 2016) (footnotes and internal quotation marks omitted) (quoting *Crimson Expl.*, 2014 WL 5449419, at *12).

[176] *Straight Path*, 2018 WL 3120804, at *15 (quoting *IRA Tr. FBO Bobbie Ahmed v. Crane*, 2017 WL 7053964, at *6 (Del. Ch. Dec. 11, 2017)).

consideration. As in *Straight Path*, entire fairness applies.[177] Whether entire fairness

should apply to the Merger or only the Amendments is not entirely clear to me from

our existing case law.[178] The answer to this question may inform the scope of

discovery. In order to begin as we mean to go on, I ask the parties to confer on a

stipulated supplemental briefing schedule to address the scope of Fireman Capital's

burden under entire fairness. The Motions are denied with respect to Count I.

### C.     Count II Fails To State A Claim For Tortious Interference.

In Count II, Plaintiffs allege all Defendants tortiously interfered with the

Class A optionholders' "reasonable probability of receiving positive value for their

---

[177] *Id.* at *16 (noting "entire fairness review is particularly appropriate here, where a controller who stood to earn different consideration or some unique benefit flexed his control to secure a self-interested deal to the detriment of minority stockholders." (alterations and internal quotation marks omitted) (quoting *Larkin*, 2016 WL 4485447, at *9)).

[178] *Houseman* and *Parnes* do not address entire fairness at all. *See generally Houseman*, 2014 WL 1600724; *Parnes*, 722 A.2d at 1243. In my view, there are conflicting principles at play. On the one hand, the thrust of *Parnes* and its progeny is that direct standing remains when a side transaction renders the merger itself unfair such that a challenge to it is effectively a challenge to the merger itself. But on the other hand, the source of Fireman Capital's conflict is the Amendments, not the Merger; requiring Fireman Capital to prove the Merger's fairness is especially strange since it is not a party to the Merger. *Straight Path* did discuss entire fairness, holding that the allegations there were "sufficient to subject the Verizon merger to entire fairness review." 2018 WL 3120804, at *16; *see also id.* at *17 n.229, *18. The recent *Straight Path* decision denying defendants' motion for summary judgment did not address entire fairness. *See generally In re Straight Path Commc'ns Inc. Consol. S'holder Litig.* (*Straight Path III*), 2022 WL 484420 (Del. Ch. Feb. 17, 2022). My review of the briefs and hearing transcript on that motion suggests to me that perhaps the scope of entire fairness remains an open question.

options from the Company."[179]  The Complaint casts this claim as simply "tortious interference"; briefing revealed Count II asserts tortious interference with a prospective economic relationship.[180]  The parties agree that "to state a claim for tortious interference with a prospective business opportunity, a plaintiff must allege: 1) the reasonable probability of a business opportunity; 2) the intentional interference by defendant with that opportunity; 3) proximate causation; and 4) damages."[181]  These elements must be considered "in light of a defendant's privilege to compete or protect his business interests in a fair and lawful manner."[182]  Among other arguments, the Moving Defendants argue Plaintiffs have not established the first element, the reasonable probability of a business opportunity.  I agree.

In order to adequately plead the first element, a claimant must allege "a *bona fide* expectancy."[183]  This element is sometimes framed as requiring "a plaintiff [to] identify a specific party who was prepared to enter into a business relationship but

---

[179] Compl. ¶ 58.

[180] *See* AB 30.

[181] *Agilent Techs., Inc. v. Kirkland*, 2009 WL 119865, at *5 (Del. Ch. Jan. 20, 2009) (citing *DeBonaventura v. Nationwide Mut. Ins. Co.*, 419 A.2d 942, 947 (Del. Ch. 1980), *aff'd*, 428 A.2d 1151 (Del. 1981)); *accord Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 608 (Del. Ch. 2010), *aff'd sub nom. ASDI, Inc. v. Beard Rsch., Inc.*, 11 A.3d 749 (Del. 2010); *Empire Fin. Servs., Inc. v. Bank of N.Y. (Del.)*, 900 A.2d 92, 98 n.19 (Del. 2006).

[182] *DeBonaventura*, 428 A.2d at 947.

[183] *World Energy Ventures, LLC v. Northwind Gulf Coast*, 2015 WL 6772638, at *7 (Del. Ch. Nov. 2, 2015) (quoting *Lipson v. Anesthesia Servs., P.A.*, 790 A.2d 1261, 1285 (Del. Ch. 2001)).

was dissuaded from doing so by the defendant."[184] For a business opportunity to be "reasonably probable," it "must be something more than a mere hope or the innate optimism of the salesman or a mere perception of a prospective business relationship."[185] The claim will be dismissed for failure to establish a reasonable probability of a business opportunity if the opportunity is too speculative[186] and a plaintiff "cannot rely on generalized allegations of harm."[187] The probability of a business opportunity "must be assessed at the time of the alleged interference."[188]

Plaintiffs' identified business opportunity is their hoped-for upside on their option contracts.[189] The Moving Defendants argue that because options are contracts, Plaintiffs' claim sounds in tortious interference with a contract, which the Moving Defendants argue Plainitffs cannot successfully plead.[190] Plaintiffs argue their expectancy exists just beyond the option contract: Count II does not claim the

---

[184] *Soterion Corp. v. Soteria Mezzanine Corp.*, 2012 WL 5378251, at *13 (Del. Ch. Oct. 31, 2012) (internal quotation marks omitted) (quoting *Agilent Techs.*, 2009 WL 119865, at *7).

[185] *Id.* (internal quotation marks omitted) (quoting *Agilent Techs.*, 2009 WL 119865, at *7); *accord Carney v. B & B Serv. Co.*, 2019 WL 5579490, at *2 (Del. Ch. Oct. 29, 2019).

[186] *See Preston Hollow Cap. LLC v. Nuveen LLC*, 2020 WL 1814756, at *12–13 (Del. Ch. Apr. 9, 2020).

[187] *Soterion Corp.*, 2012 WL 5378251, at *13 (internal quotation marks omitted) (quoting *Agilent Techs.*, 2009 WL 119865, at *7).

[188] *Malpiede v. Townson*, 780 A.2d 1075, 1099 (Del. 2001).

[189] *See* Compl. ¶ 58.

[190] *See* OB 34–36.

Amendments breached their contracts' terms, but instead claims the Amendments frustrated those contracts' purposes by depriving optionholders of value.[191]

Even if one can hold an actionable expectancy over and above one's contractual expectations,[192] Plaintiffs have not sufficiently pled an actionable expectancy. Plaintiffs rely exclusively on the conclusory allegation that they had a "reasonable probability of receiving positive value for their options from the Company."[193] This bare statement is insufficient to establish a *bona fide* expectancy. Plaintiffs plead no facts to quantify that expectancy, to support its existence, or to explain why it was reasonable to hold it. Rather, it appears their expectancy is based on a "mere hope" that their options would be in the money.[194] Options, like other derivative securities, inherently involve risk. Plaintiffs' speculation or hope that they picked the right side of their bet is not, standing alone, sufficient to establish a reasonable probability of a business relationship. The Motions are granted with respect to Count II.

---

[191] *See* AB 34–35 & n.135.

[192] *See Fox v. CDX Hldgs., Inc.*, 2015 WL 4571398, at *35 (Del. Ch. July 28, 2015) ("The rights and obligations of the parties to the option are governed by the terms of their contract."), *aff'd*, 141 A.3d 1037 (Del. 2016). Options present sources of value that are both within and beyond the contractual terms: they hold intrinsic value from their contract terms and the stock's market value, but also hold time value derived from the possibility of their appreciation. *See AT&T Corp. v. Lillis*, 953 A.2d 241, 243 n.2 (Del. 2008).

[193] Compl. ¶ 58; *see* AB 31 (citing Compl. ¶ 58).

[194] *See Soterion Corp.*, 2012 WL 5378251, at *13 (internal quotation marks omitted) (quoting *Agilent Techs*, 2009 WL 119865, at *7).

### D. The Motions Do Not Establish A Basis To Dismiss Count III.

Count III asserts that Fireman Capital, Crocket, and Bassler conspired to commit the breaches of fiduciary duty underlying Count I.[195] Plaintiffs must plead three elements to state a claim for civil conspiracy: "(1) a confederation or combination of two or more persons; (2) an unlawful act done in furtherance of the conspiracy; and (3) actual damage."[196] The Moving Defendants seek to dismiss Count III because it fails to allege knowing participation by Fireman Capital.[197] While knowing participation is an element of the closely related tort of aiding and abetting,[198] it is not an element of civil conspiracy.[199] Reading the Motions charitably, I take the Moving Defendants to argue that Fireman Capital did not take

---

[195] *See* Compl. ¶¶ 61–67.

[196] *AeroGlobal Cap. Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 437 n.8 (Del. 2005) (citing *Nicolet, Inc. v. Nutt*, 525 A.2d 146, 149 (Del. 1987)).

[197] *See* OB 43–44. The Moving Defendants reference the "Fireman Entities," but Fireman Capital III is not a defendant to Count III.

[198] *See, e.g.*, *Allied Cap. Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1038–39 (Del. Ch. 2006) ("Like the test for civil conspiracy, the test for stating an aiding and abetting claim is a stringent one, turning on proof of scienter—a plaintiff must prove: (1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty and (3) knowing participation in that breach by the non-fiduciary." (citing *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 72 (Del. 1995))).

[199] I acknowledge that in the fiduciary duty context, aiding and abetting claims are often treated as conterminous with civil conspiracy. *See OptimisCorp v. Waite*, 2015 WL 5147038, at *57 (Del. Ch. Aug. 26, 2015), *aff'd*, 137 A.3d 970 (Del. 2016). This overlap notwithstanding, Count III appears to allege a fiduciary (Fireman Capital) conspired with non-fiduciaries (Crocket and Bassler) to breach its duty of loyalty, not that non-fiduciaries aided a fiduciary in its breach.

an unlawful act in furtherance of the conspiracy. For the reasons outlined in my discussion of Count I, I disagree. The Moving Defendants offer no other basis to dismiss Count III. The Motions are denied with respect to Count III.

### E. Count IV Fails To State A Claim For Civil Conspiracy.

Count IV asserts that Fireman Capital, Crocket, and Bassler conspired to commit the tortious interference underlying Count II. Plaintiffs cannot establish such a claim. The second element makes clear that "[c]ivil conspiracy is not an independent cause of action; it must be predicated on an underlying wrong."[200] Lacking a well-pled underlying claim for tortious interference, Count IV cannot state a claim.[201] The Motions are granted with respect to Count IV.

## III. CONCLUSION

For the foregoing reasons, the Motions are **GRANTED** in part and **DENIED** in part. The Motions are **GRANTED** with respect to Counts II and IV. The Motions are **DENIED** with respect to Counts I and III. The parties shall submit a stipulated implementing order within twenty days of this decision. They shall also submit a stipulated briefing schedule on the scope of Fireman Capital's entire fairness burden.

---

[200] *Kuroda*, 971 A.2d at 892.

[201] *E.g.*, *id.* at 892–93.